81 A.3d 767

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ronald Lee WEISS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 20, 2012.

Decided Oct. 31, 2013.

666

674

676

James Joseph McHugh Jr., Esq., Shawn Nola, Esq., Defender Association of Philadelphia, for Ronald Lee Weiss.

Gregory Joseph Simatic, Esq., Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice BAER.

Ronald Lee Weiss (Appellant) appeals from the denial of guilt-phase claims raised in his petition for post-conviction relief, filed pursuant to 42 Pa.C.S. § 9541 *et seq.* We conclude that the Post Conviction Relief Act (PCRA) court's rejection of Appellant's guilt-phase claims was supported by the record and free from legal error. Because the PCRA court granted relief on a penalty phase issue and the Commonwealth has not cross-appealed, Appellant will be afforded a new penalty hearing. Accordingly, the order of the PCRA court is affirmed.

As we described in our opinion on Appellant's direct appeal, sixteen-year old Barbara Bruzda (Victim) was last seen on October 23, 1978, playing pool with Appellant at her family's tavern and later that evening at a party with Appellant at the home of Henry Hobart. *See Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958 (2001)(*Weiss I*). Several witnesses saw

Victim and Appellant leave the party together. Before he left the party, Appellant may have borrowed a jack and tire iron from Mr. Hobart, which he never returned.[1] Five months later, on March 20, 1979, hikers found the victim's body wrapped in a distinctive, homemade red and white quilt in a remote area of Indiana County.

At the time of Victim's disappearance, Appellant lived with his wife, Sharon Pearson (Ex-wife). Although suspicion immediately fell on Appellant, the police were initially unable to obtain sufficient evidence of Appellant's guilt. In 1985, however, after Ex-wife separated from Appellant, she reported to the police that on the night of October 23, 1978, Appellant had been driving the Buick the couple shared. She cleaned out the car on October 24, 1978, as was her custom after Appellant drove the vehicle, and she made two important observations. First, she observed blood on the back of the front seat, on the interior of the roof, and on the back seat of the car. Second, she observed that the red and white quilt she kept in the car to cover the damaged back seat was missing. She was able to identify the quilt in which the victim's body was found as the handmade quilt that was missing from the car. Appellant gave the car to a junkyard in the Spring of 1979 even though, according to Ex-wife's subsequent testimony, nothing was apparently wrong with it.

Appellant was arrested in 1985. However, the prosecutor *nolle prossed* the charges in 1987, when the trial court determined that Ex-wife was incompetent to testify due to spousal privilege. *See* 42 Pa.C.S. § 5913 (1987) (barring spouses from testifying against each other).[2] This section was amended in 1989 to permit spousal testimony in cases of homicide.[3] An

---

1. Mr. Hobart testified at Appellant's trial that on the evening of October 23, 1978, Appellant asked to borrow a jack and tire iron, which he did not return, but conceded on cross-examination that it may have been another individual who asked to borrow these items.

2. In 1985, Section 5913 provided that "... in a criminal proceeding husband and wife shall not be competent or permitted to testify against each other ..." The statute further provided several exceptions not relevant herein.

3. In 1989, Section 5913 was amended to provide, in relevant part, as follows:

investigative grand jury was empaneled in 1993, but did not return an indictment.

Meanwhile, in 1989 Appellant committed a robbery and assault with a codefendant, David Townsend, which involved striking another man with a tire iron. During his incarceration before and after the assault, Appellant was briefly confined, at different times, with Kermeth Wright and Samuel Tribuiani. Each of these three men (Townsend, Wright, and Tribuiani) later testified at Appellant's trial that they heard Appellant confess to the murder of Victim.

In 1995, police still had made no arrest in Victim's murder, other than the aborted 1985 arrest of Appellant. The Commonwealth again reviewed the circumstances surrounding the murder, and concluded that it still had insufficient evidence to prosecute Appellant successfully. Following this 1995 decision not to prosecute, prosecutors became aware of the statements from two jailhouse informants, Kermeth Wright and Samuel Tribuiani, who stated that Appellant confessed to them individually and at separate times that he killed the victim. Finally, with this new evidence, Appellant was arrested and charged with Victim's murder on February 19, 1997. The trial court appointed counsel to represent Appellant. Appointed counsel moved for the appointment of new counsel, asserting a conflict of interest premised on one of Appellant's attorneys' prior representation of one of the Commonwealth witnesses against Appellant, Kermeth Wright. The trial court denied the motion without a hearing.

During pre-trial discovery, the Commonwealth identified Kermeth Wright and Samuel Tribuiani as potential witnesses. The Commonwealth averred that there were no deals with

Except as otherwise provided in this subchapter, in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse except that there shall be no such privilege:

\* \* \*

(4) in any criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape.

42 Pa.C.S. § 5913.

these witnesses, and it had not made any promises to them in exchange for their cooperation. At Appellant's trial, the Commonwealth introduced twenty-six witnesses. The Commonwealth's forensic evidence demonstrated that the victim died of massive skull fractures inflicted with an object such as a pry bar, pipe, or tire iron, and that Victim was hit at least twice.

The victim's mother, Roxie Bruzda, (Victim's Mother) testified that she observed Victim and Appellant playing pool at the family's tavern on the night she disappeared. Several other witnesses testified that they saw Appellant with Victim at Mr. Hobart's house the night she disappeared, and Mr. Hobart testified about possibly providing Appellant with a jack and tire iron. Ex-wife testified consistently with her prior statement to police that she and Appellant shared a car, that Appellant used the car the night the victim disappeared, and that the day after the disappearance, she observed "a lot" of blood in the car, specifically, on the back of the front seats, the back seat, and the interior roof. She testified that Appellant told her the blood came from a small abrasion on his knuckle. Ex-wife further identified the distinctive handmade quilt, in which Victim's body was found, as the one she kept in the back seat of the Buick, which was missing from the car the morning after Victim disappeared.[4]

Additionally, through the testimony of several witnesses, the Commonwealth introduced evidence of Appellant's evolving explanations of what transpired on October 23, 1978. Specifically, Victim's Mother telephoned Appellant on October 25, 1978, looking for her daughter. Appellant explained that he left the tavern shortly after Victim left, and saw the victim hitchhiking with a young man. Appellant stated that he picked up the two hitchhikers, who indicated they were on their way to Saltsburg, Pennsylvania, and dropped them off in Clarksburg, Pennsylvania. Appellant added that Victim had

4. By 1997, the statutory prohibition of spousal testimony had been removed by the legislature in homicide cases and only permitted the privilege to be invoked by one spouse "not to testify against his or her then lawful spouse ..." 42 Pa.C.S. § 5913. Appellant raises no issue relating to Ex-wife's testimony in this regard.

been running away from home. Unsatisfied with his response, Victim's Mother drove to Appellant's residence and confronted him. Appellant added to his prior explanation that when he dropped the two hitchhikers off, there was a black pick-up truck waiting for them, and the two hitchhikers got into the truck and it drove away in the direction of Saltsburg.

A police officer with the Young Township, Pennsylvania, Police Department, Trooper Jakela, testified that on October 25, 1978, he received information that the victim may be at Appellant's residence. While he was investigating this tip, Appellant repeated the explanation he had provided to Victim's Mother. Appellant also offered a physical description of the driver of the pick-up truck. Appellant repeated this explanation to police again in November and December, 1978, and January, 1979, explaining that after he dropped the hitchhikers off, he went straight home. Appellant did not mention attending the party at Mr. Hobart's house. None of the witnesses who observed Appellant in the days following Victim's disappearance observed any injuries on Appellant.[5]

Following the presentation at trial of testimony of Appellant's repeated assertions to others that he picked up Victim while she was hitchhiking and dropped her off in Clarksburg, the Commonwealth offered the testimony of several witnesses who observed Appellant and Victim arrive together at Henry Hobart's house on the evening of October 23, 1978, and testified that the two were affectionate to each other, and that they left the party together. The Commonwealth next offered the testimony of two witnesses who received correspondence from Appellant after he was arrested for the victim's murder, and after he was aware that the Commonwealth had several witnesses who saw Appellant with Victim at Mr. Hobart's house (thereby refuting his explanation that he dropped her off in Clarksburg and went home).

In this correspondence, Appellant detailed a different version of what transpired on October 23, 1978. Specifically, he

5. The lack of noticeable injuries in the days following the victim's disappearance is relevant to Appellant's subsequent assertions that he was brutally assaulted that night, as discussed below.

indicated that he did not kill Victim but he knew who did, and identified his ex-wife's two brothers, Larry and Gary Priest. Appellant explained that he believed his ex-wife asked her brothers to kill him because of a life insurance policy, and that the brothers attempted to comply while Appellant was driving Victim home after leaving Mr. Hobart's party. He stated that as he was driving down a remote road, the Priest brothers, driving two separate cars, intercepted him, stopped his car, pulled him out of the vehicle, beat him until he was unconscious, left him to die, and when he awoke, the victim was gone. He believed they killed Victim because she witnessed the assault. He explained that he did not come forward with what happened because the brothers had threatened the life of his parents, wife, and children if he ever told anyone what had happened.

Ernest Sachweh testified for the Commonwealth that he was with Appellant on a day in the fall of 1978, just after the disappearance, when Victim's Mother came to Appellant's house looking for the victim. After Victim's Mother left, Appellant told Mr. Sachweh that he wished she would leave him alone, and, to that end, asked Mr. Sachweh to call Victim's Mother and report falsely that he had seen the victim alive and well with her boyfriend, and that she just wanted to be left alone. Mr. Sachweh did not comply.

Mr. Wright and Mr. Tribuiani testified for the Commonwealth that while incarcerated for other crimes Appellant confessed to each of them that he had killed Victim. Mr. Wright testified that Appellant confessed to him in 1985, and Mr. Tribuiani testified that Appellant confessed to him in 1993 that he killed Victim to prevent her from "tell[ing] on their sex parties and they were in some kind of weed business or whatever." Notes of Testimony (N.T.), 7/7/1997, p. 557. Mr. Wright and Mr. Tribuiani testified that they had received no special treatment in exchange for their testimony. James Drylie testified that he had observed marijuana plants growing on Appellant's property.

Appellant testified on his own behalf and denied any involvement. His testimony centered on explaining the discrep-

ancy in his initial statements to police and his subsequent version implicating the Priest brothers. He admitted that his hitchhiker story was a lie. Instead, according to his trial testimony, after he left the tavern he saw two people hitchhiking, stopped to give them a ride, and recognized one of them as Victim. He testified that they asked for a ride to Clarksburg, but the victim changed her mind and asked instead for a ride to Mr. Hobart's house. Appellant dropped off the male hitchhiker, and continued to Mr. Hobart's house with Victim. Once there, according to Appellant, he decided to stay for a short while because he had something to discuss with Mr. Hobart. As he was leaving the party, Victim requested a ride home. Appellant complied, and, while Victim was a passenger in his car on a remote road, two vehicles, each driven by one of the Priest brothers, forced his car to stop; dragged him from his car; beat him with a club; left him unconscious in a ditch; and, when he regained consciousness, Victim was gone. Appellant maintained that the Priest brothers acted at the direction of Ex-wife, their sister. He further testified that when he awoke, he went to his mother's house to tend to his injuries, thus attempting to explain the blood in the car. He stated that he did not reveal the truth before trial because the following morning, the brothers accosted him in the parking lot of a mall and told him that if he ever told anyone about the beating they would kill him and his family.[6] In the course of testifying, Appellant stated that he could never strike someone with a tire iron.

In rebuttal, the Commonwealth called David Townsend, who testified that in 1989 he observed Appellant strike someone with a tire iron in a robbery and assault. Mr. Townsend further testified that, also in 1989, Appellant confessed that he had killed a girl, and if Mr. Townsend did not keep quiet about the 1989 assault, he would end up like Victim.[7]

6. As described more fully below, this begs the question of why Appellant failed to disclose this account between October of 1978, when the threat allegedly occurred, and his trial in 1997, notwithstanding that in the intervening nineteen years, his parents had died, his wife had divorced him, and his children grew to adulthood.

7. Apparently the Commonwealth had attempted to reach Mr. Townsend to call him as a penalty phase witness in support of evidence of

On July 9, 1997, the jury found Appellant guilty of first-degree murder. Following a penalty hearing where the jury found one aggravating circumstance (a significant history of violent felony convictions involving the use or threat of violence) and no mitigating circumstances, the jury sentenced Appellant to death. Appellant appealed, represented by trial counsel. We affirmed. *See Weiss I.*

Following our affirmance, counsel from the Defender Association of Philadelphia represented Appellant for post-conviction proceedings. On May 15, 2003, Appellant filed a counseled PCRA petition raising nineteen claims of entitlement to relief. Appellant argued that the Commonwealth had violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide Appellant's counsel with copies of letters it had written to the Department of Corrections and the Board of Probation and Parole (Parole Board), among others, asking those authorities to consider the cooperation of Commonwealth witnesses Mr. Wright and Mr. Tribuiani when deciding whether to grant them parole.[8] Appellant also claimed that trial counsel represented him under a conflict of interest because of the prior representation of Commonwealth witness, Mr. Wright. The PCRA court held hearings on the petition in March, 2007.

Following the hearings, on July 31, 2007, the PCRA court issued an opinion and order granting Appellant a new trial. The court found that the Commonwealth had violated its obligations under *Brady*, by failing to disclose impeachment evidence relevant to the credibility of Mr. Wright and Mr.

aggravating circumstances, but had been unable to locate him. He called the district attorney's office on the morning of Appellant's trial, responding to the efforts to locate him, and revealed to the prosecutor that Appellant had confessed to the murder in 1989. The Commonwealth attempted to call Mr. Townsend during its guilt-phase case-in-chief, but the trial court would not permit it because of possible prejudice to the defense. Accordingly, the Commonwealth called Mr. Townsend only in rebuttal following Appellant's testimony during the guilt-phase that he would never strike someone with a tire iron.

8. As will be discussed more fully below, Appellant also claimed that the prosecution violated its obligations as to records related to Mr. Townsend.

Tribuiani. Considering the testimony of these two witnesses to be "the crux" of the Commonwealth's case, and their credibility of "grave importance," the court awarded a new trial on that basis. PCRA Court Findings of Fact, 10/31/2007, at 1. With regard to the conflict of interest claim, the PCRA court held that the trial court erred by failing to conduct a hearing on the motion for the appointment of new counsel, and concluded that trial counsel had an actual conflict of interest in representing Appellant, because counsel was simultaneously representing a Commonwealth witness, Mr. Wright, on an unrelated matter.

The Commonwealth appealed the PCRA court's grant of a new trial to this Court. *See Commonwealth v. Weiss*, 604 Pa. 573, 986 A.2d 808 (2009) (*Weiss II* ). We reversed. We recognized that due process is offended when the prosecution withholds evidence favorable to the accused, *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, that impeachment evidence falls within the *Brady* rule, and that constitutional error results from its suppression by the government "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Reviewing the opinion of the PCRA court, we held that the court did not make any explicit determination as to whether the prosecution's failure to disclose information relating to Mr. Wright's and Mr. Tribuiani's credibility created a reasonable probability of a different outcome. *Weiss II*, 986 A.2d at 815. Instead, "a fair reading of the PCRA court's cursory opinions in this matter reflects that the court concluded a new trial was warranted apparently simply because the Commonwealth failed to disclose alleged impeachment evidence that would have been helpful to the defense." *Id.*

This Court further disagreed with the PCRA court's characterization of the jailhouse informants' testimony as the crux of the Commonwealth's case, and found that this finding was erroneous and not supported by the record. *Id.* at 816. Rather, focusing on the evidence against Appellant, the Court

held that other testimony was damaging to the defense and helpful to the prosecution. Accordingly, the Court remanded to the PCRA court for it to address the salient inquiry of whether Appellant received a fair trial under the circumstances. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that in determining whether there is a reasonable probability of a different outcome resulting from the prosecution's suppression of *Brady* material, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.")). We directed the PCRA court that in making this determination, it was to review all of the evidence presented at trial for the potential negative effect disclosure of the impeachment evidence would have had thereon. *Weiss II*, 986 A.2d at 816.[9]

We next turned to the Commonwealth's argument that the PCRA court erred in reaching the merits of Appellant's claim that counsel acted under a conflict of interest, because, according to the Commonwealth, Appellant waived it by not challenging on direct appeal the trial court's pre-trial ruling rejecting his motion for appointment of new counsel. We agreed that the only viable claim resulting from the trial court's failure in this regard was a claim of counsel ineffectiveness for failing to raise this issue on appeal. On the merits of the ineffectiveness issue, we expressed disagreement with the PCRA court's finding that counsel was conflicted due to simultaneous representation of Appellant and Mr. Wright.

9. This author, joined by Justice Greenspan, dissented from the Court's remand. It was this author's belief that a remand was unnecessary because it was evident from the PCRA court's cursory opinion that it believed Appellant was prejudiced by the Commonwealth's failure to disclose evidence impeaching the credibility of Mr. Wright and Mr. Tribuiani, and the result was, in the PCRA court's reasonable estimation, an unfair trial. In dissent, this author, respectfully, further expressed disagreement with the Majority's rejection of the PCRA court's factual finding that the testimony of these two witnesses was the crux of the Commonwealth's case. Notwithstanding this dissent, it is axiomatic that the majority opinion represents binding precedent and the law of the case.

Rather, this Court's review of the record revealed that the circumstances here involved successive, rather than simultaneous, representation. Specifically, the public defender's office began representing Mr. Wright in an unrelated matter in August 1995, Mr. Wright was sentenced January 15, 1996, and Appellant's trial began after Mr. Wright's sentence was imposed.

When the case was remanded, the PCRA court judge who originally heard the case and who had granted a new trial had retired. Consequently, the case was reassigned to another judge, who granted a *de novo* hearing. When this judge's unexpected death preceded completion of that hearing, a third judge was appointed to hear the case. The new judge incorporated the existing PCRA record by agreement of the parties, held a three-day hearing at which the parties submitted additional evidence, and issued an opinion on the merits denying relief on all guilt phase issues.

With respect to the remanded *Brady* issue concerning Mr. Wright and Mr. Tribuiani, the PCRA court accepted the prior PCRA court's finding that the prosecution violated its duty to disclose evidence favorable to the accused by withholding information that the defense could have utilized to impeach Mr. Wright and Mr. Tribuiani. It held, however, that the Commonwealth's failure in this regard did not deprive Appellant of a fair trial or undermine confidence in the verdict.

In reaching this conclusion the PCRA court examined the evidence against Appellant as a whole. It observed that the two jailhouse informants were not the sole witnesses against Appellant, and highlighted other compelling evidence against Appellant: the testimony of David Townsend that Appellant had confessed to killing Victim; testimony establishing that Appellant and Victim left the party at Mr. Hobart's house together; testimony by Ex-wife about the blood in the car and identifying the blanket in which the victim's body was found as the one which was missing from the car Appellant drove the night Victim disappeared; and testimony by Ernest Sachweh that Appellant asked him to lie to Victim's Mother on his behalf.

According to the PCRA court, however, the most damning evidence against Appellant was his own testimony, which it stated would have guaranteed a conviction even if the jury had known of the impeachment evidence against Mr. Wright and Mr. Tribuiani.

The court considered that Appellant's trial testimony was not persuasive, and that it failed to answer numerous questions, such as why Victim changed her mind and decided to go to Mr. Hobart's house, and then home, when Appellant was leaving; why she and Appellant appeared friendly and even affectionate together at the party; how the Priest brothers could have known Appellant would be on a certain road at a certain time when even Appellant did not know he would be driving Victim home from Mr. Hobart's house; despite his assertion that the brothers split his head open, no one who saw him thereafter witnessed any injuries except, according to Appellant, his mother, who had passed away by the time of trial; his claim that he believed Ex-wife asked her brothers to kill him was not consistent with his returning home to her following the alleged assault and continuing to live with her; he did not explain how the Priest brothers knew he would be in the mall parking lot the following morning, where he testified they threatened him; and why the threat to his family allegedly kept Appellant quiet about Victim's murder long after his parents had died, his children had grown, and his wife had divorced him. The PCRA court held that Appellant's testimony left the jury with the impression of a man, on trial for his life, who only remembered the details he had fabricated and who, having admittedly lied to the police and others for nearly twenty years, was still being untruthful about what happened on October 23, 1978.

With regard to the post-conviction penalty phase issues, the Commonwealth conceded that penalty phase relief was appropriate, and the PCRA court agreed, thereby granting a new penalty phase. The Commonwealth has not appealed, leaving only guilt phase issues for our review on appeal.

■ In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination "is supported by the record and free of legal error." *Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108 (2012) (citing *Commonwealth v. Rainey,* 593 Pa. 67, 928 A.2d 215, 223 (2007)); *Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624 (2005). The PCRA provides that to be entitled to relief, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in Section 9543(a)(2), and his claims have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(2).[10] An issue is previously litigated if "the highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). An issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b).

10. This section provides:
 (a) General rule.—To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:
 \* \* \*
 (2) That the conviction or sentence resulted from one or more of the following:
 (i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.
 (ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.
 (iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent.
 (iv) The improper obstruction by government officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.
 (v) Deleted.
 (vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.
 (vii) The imposition of a sentence greater than the lawful maximum.
 (viii) A proceeding in a tribunal without jurisdiction.
 42 Pa.C.S. § 9543(a)(2).

■ To succeed on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Sepulveda,* 55 A.3d at 1117. In Pennsylvania, we have applied the *Strickland* test by looking to three elements. The petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Sepulveda,* 55 A.3d at 1117 (citing *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987)); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (explaining that, to establish an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that such deficiencies prejudiced the defense). *See also Commonwealth v. Williams,* 594 Pa. 366, 936 A.2d 12, 19 (2007) ("It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland v. Washington.* . . .") (quoting *Commonwealth v. Gribble,* 580 Pa. 647, 863 A.2d 455, 460 (2004) (collecting cases)). Counsel is presumed to have rendered effective assistance. *Sepulveda,* 55 A.3d at 1117. Finally, both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first. *Id.* at 1117–18; *Strickland, supra; Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 278 (2006).

## I. *Brady* claims

■ Due process is offended when the prosecution withholds material evidence favorable to the accused. *Brady,* 373

U.S. at 87, 83 S.Ct. 1194. *See also Weiss II*, 986 A.2d at 814; (citing *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167 (2000)). The *Brady* rule encompasses impeachment evidence such as information as to any potential understanding between the prosecution and a witness, because such information is relevant to the witness's credibility. *See United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule); *Commonwealth v. Spotz*, 616 Pa. 164, 47 A.3d 63, 84 (2012); *Strong*, 761 A.2d at 1175 ("Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case [even when] that evidence is merely a promise or an understanding between the prosecution and the witness."). Thus, to establish a *Brady* violation, an appellant must prove three elements: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. *Spotz*, 47 A.3d at 84; *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 854 (2005).

Pursuant to *Brady* and its progeny, the prosecutor has a duty to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Pursuant to *Kyles*, "the prosecutor's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1142 (2001). Moreover, there is no *Brady* violation when the defense has equal access to the allegedly withheld evidence. *See Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1248 (2006) ("It is well established that no *Brady* violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." (internal citation omitted)).

▉▉▉▉ As we explained in *Weiss II*, 986 A.2d at 814–15, where we addressed the relevant legal standard to employ in assessing the prejudice prong of Appellant's *Brady* claims, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. In determining if a reasonable probability of a different outcome has been demonstrated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Weiss II*, 986 A.2d at 815 (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). *See also Bagley*, 473 U.S. at 678, 105 S.Ct. 3375 (explaining that a reasonable probability of a different result is shown when the government's suppression of evidence "undermines confidence in the outcome of the trial."). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 887 (2002).

▉▉▉▉ Rather, to be entitled to a new trial for the Commonwealth's failure to disclose evidence affecting a witness's credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence. *Weiss II*, 986 A.2d at 815 (citing *Commonwealth v. Johnson*, 556 Pa. 216, 727 A.2d 1089, 1094 (1999)). *See also Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). In this regard,

"[m]ere speculation" by a defendant, however, will not be sufficient to meet this burden. *See Wood v. Bartholomew*, 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). In assessing the significance of the evidence improperly withheld, a reviewing court is to bear in mind that not every piece of evidence against a defendant would necessarily have been directly undercut had the *Brady* evidence been disclosed. *Weiss II*, 986 A.2d at 815 (citing *Kyles*, 514 U.S. at 451, 115 S.Ct. 1555). To establish a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed, a defendant necessarily must explain how the undisclosed evidence would have changed the result of the proceeding. *See Commonwealth v. Willis*, 616 Pa. 48, 46 A.3d 648, 670 (2012) (Opinion announcing the judgment of the court).

Appellant raises *Brady* claims with respect to Mr. Wright and Mr. Tribuiani, which he discusses together, and to Mr. Townsend. We will first examine the claim which caused our prior remand, and which was premised on agreements between the Commonwealth and Mr. Wright and Mr. Tribuiani.

### A. Kermeth Wright and Samuel Tribuiani

We observed in *Weiss II* that the first PCRA court to hear Appellant's *Brady* claim found without hesitation that the Commonwealth had violated its obligations under *Brady* by failing to disclose impeachment evidence relevant to the credibility of Tribuiani and Wright. The Commonwealth averred that it had no agreements with these witnesses and that nothing had been promised in exchange for their cooperation, and failed to provide, during discovery, copies of letters it had written to the Parole Board and the Department of Corrections, among others, asking these authorities to consider the witnesses' cooperation when deciding whether to grant them parole or other early release. *Weiss II*, 986 A.2d at 812. On remand from this Court, the PCRA court considered our decision in *Weiss II* to have implicitly affirmed the first PCRA court's finding that the Commonwealth violated its duty to disclose with respect to this evidence, and reasoned that both witnesses came to expect that the prosecutor's representations

about their cooperation would result in leniency. Had the jurors been privy to the communications on these witnesses' behalf, according to the PCRA court, they may well have concluded that these witnesses were expecting consideration in exchange for their testimony against Appellant.

The only question remaining for the PCRA court with regard to the Commonwealth's violation of its disclosure obligation in this regard was whether it undermined confidence in the outcome of Appellant's trial, "such as would have created a reasonable probability of a different result." *Weiss II*, 986 A.2d at 815. Our specific remand directive bears repeating:

The PCRA court also fails to specifically address whether or how the Commonwealth's withholding of alleged impeachment evidence undermines confidence in the verdict. Simply put, the PCRA court has not directly addressed the salient inquiry of whether or not [Appellant] received a fair trial under the circumstances. Accordingly, we remand for the court to do so. We emphasize on remand that the question is not whether the jury would likely have reached a different verdict had the alleged impeachment evidence regarding Wright and Tribuiani's credibility been disclosed, but whether, in the absence of the alleged impeachment evidence, [Appellant] got a fair trial worthy of confidence in the verdict. In its determination, the court must consider whether disclosure of the impeachment evidence to competent counsel would have made a different result reasonably probable. This will necessarily entail a review of all the evidence presented at trial, not for its sufficiency, but for the potential negative effect disclosure of the alleged impeachment evidence would have had thereon. For example, the impact of Sharon Pearson's testimony regarding the quilt and her interactions with [Appellant] on the morning of October 24, 1978, would undoubtedly have been completely unaffected by disclosure of the impeachment evidence casting doubt on the reliability of Wright and Tribuiani. We further emphasize that we express no view as to the

merits of [Appellant's] *Brady* claim, but remand to the PCRA court for a meaningful analysis of the claim.

*Weiss II*, 986 A.2d at 816 (citations omitted).[11]

Analyzing the evidence presented at trial as we directed, the PCRA court found that even without the improperly withheld impeachment evidence, the jury's verdict was worthy of every confidence. The court explained that the evidence against Appellant consisted of far more than the testimony of Mr. Wright and Mr. Tribuiani. It examined the evidence described above in reaching this conclusion, specifically, the testimony of the following witnesses: guests at Mr. Hobart's party who saw Appellant with Victim; Mr. Hobart; Ex-wife, who testified regarding blood in the car, Appellant's explanation that the blood came from a small abrasion on his knuckle, and identified the quilt in which the victim's body was discovered as the same that had been in the car Appellant was driving; Earnest Sachweh's testimony regarding Appellant's request that he falsely report seeing and speaking with Victim; and Mr. Townsend's rebuttal testimony that Appellant also confessed to him. Most importantly to the PCRA court, however, was Appellant's own testimony, which the court characterized as the most damaging evidence the jury considered, and which "would have assuredly guaranteed a conviction even had the jury known about the impeachment evidence against Wright and Tribuiani." PCRA Opinion of March 19, 2012, at 10.

11. Appellant argues that the trial court, and, implicitly, this Court in *Weiss II*, has utilized the wrong legal standard to assess *Brady* prejudice, and that we should instead apply what he characterizes as a more defense-friendly standard of prejudice, applicable where the prosecutor knowingly utilizes false testimony to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (holding that the knowing use of false testimony to obtain a conviction violates due process even where the false testimony goes only to the credibility of a witness). Appellant, however, has consistently presented his claim in accord with a failure to disclose argument, and relied on the *Brady* line of cases and standards discussed above. Therefore, we reject the argument that we have utilized an incorrect legal standard, and instead embrace the *Brady* analysis we employed in *Weiss II* because it reflects the proper articulation of materiality as Appellant has presented it.

The PCRA court described Appellant's testimony as internally inconsistent and conflicting with his prior statements to police. Specifically, Appellant's testimony that he picked up two hitchhikers on October 23, 1978, a man and Victim, who were looking for a ride to Clarksburg, that Victim changed her mind once they arrived in Clarksburg and asked Appellant to take her to Mr. Hobart's house, and that he dropped the male hitchhiker off alone in Clarksburg and proceeded to Mr. Hobart's home with Victim, all conflicted with Appellant's prior statements to police and Victim's Mother that he dropped the victim off with the unknown hitchhiker in Clarksburg and observed them enter a truck that was waiting for them.

Additionally, the PCRA court observed that Appellant's testimony proceeded to contradict the testimony of several Commonwealth witnesses who observed Appellant and Victim at Mr. Hobart's house as "cozy" when Appellant stated that he had no interaction with her at the party until he was preparing to leave, when she asked for a ride home. Moreover, the court considered Appellant's recitation of the subsequent beating by the Priest brothers as absurd, because Appellant asked the jury to believe that as Appellant and the victim were driving down a remote road, their travel was impeded by two vehicles driven by Larry and Gary Priest, who had somehow become aware of Appellant's unexpected detour down a remote road at that precise time, and who dragged Appellant from the car and beat him so severely that his head was "split open," although Appellant could not explain why no one observed this head wound or any other injuries in the hours and days following this event.

The court expressed further incredulity about Appellant's testimony that his reaction to the beating was to go home to Ex-wife, whom he suspected of arranging for her brothers to assault him. He did not contact the authorities to report the assault or Victim's disappearance, or reveal that the brothers could have been responsible for her disappearance. Instead, he continued to live with Ex-wife for several more years, allegedly because the morning after the beating the Priest

brothers somehow knew of his movements, accosted him in the parking lot of the mall, threatened to kill his entire family, including, apparently, their sister, Ex-wife, who had arranged the assault, if he revealed the beating to anyone, and thereby assured his silence until he was charged with Victim's murder nineteen years later in 1997. Appellant made no attempt to resolve the incongruity of harboring concern for the safety of the woman whom he believed had instigated his attempted murder. The PCRA court noted that Appellant did not attempt to account for the numerous witnesses who testified contrary to his recollection.

Due to Appellant's "incredible" testimony and the other "overwhelming" evidence against him, the PCRA court held that the prosecutor's failure to turn over impeachment evidence about Mr. Wright and Mr. Tribuiani did not undermine confidence in the verdict, and Appellant was not entitled to a new trial on that basis.

On appeal to this Court, Appellant acknowledges that the PCRA court's rejection of his *Brady* claim as to Mr. Wright and Mr. Tribuiani was based on the court's conclusion that Appellant's own testimony was the most damaging evidence against him. He argues that this inquiry failed to consider that materiality of the suppressed evidence under *Brady* must be evaluated in terms of how it could have been used effectively by the defense. *See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375 (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, to explain that impeachment evidence "is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal."). In this regard he asserts that one way in which the disclosure of the impeachment evidence would have affected the defense would have been in "obviating the necessity of, and the risks involved in," Appellant testifying at trial. Appellant's Brief at 18. He asserts his own testimony "was made necessary in large part by Wright's and Tribuiani's unimpeached testimony . . ." *Id.* at 25.

Examining the evidence against him independent of his own testimony, Appellant argues that, contrary to the PCRA

court's conclusion, the tainted testimony of Mr. Wright and Mr. Tribuiani was central to the Commonwealth's case as demonstrated simply by the Commonwealth's decision, in 1995, that it could not prosecute Appellant due to insufficient evidence. It was only when these two witnesses came forward that the Commonwealth changed course and arrested Appellant. Appellant maintains that without this testimony, the Commonwealth had no case. Appellant further claims that the defense could have used the undisclosed evidence of requests for leniency for Mr. Wright and Mr. Tribuiani to question the investigation.

Focusing on the other evidence against him, Appellant argues that it was circumstantial and limited. He argues that the strongest remaining evidence against him was the testimony of Mr. Townsend, which he argues was also subject to *Brady* violations by the Commonwealth as discussed below, and the testimony of Ex-wife, which he argues was not inconsistent with his defense. He maintains that without the tainted testimony, the Commonwealth could not have sustained its burden of proof.

As addressed below, Appellant supports his argument with reliance on *Breakiron v. Horn*, 642 F.3d 126 (3d Cir.2011) (holding that a jailhouse informant's testimony was material to a conviction and the Commonwealth's failure to disclose impeachment evidence relevant to the witness in violation of *Brady* warranted reversal, particularly because the informant's testimony contradicted the defendant's) and *Munchinski v. Wilson*, 694 F.3d 308 (3d Cir.2012) (holding that considering the evidence as a whole, including evidence the Commonwealth unlawfully suppressed, no reasonable juror could have voted to convict).

In response, the Commonwealth argues that our role as a reviewing court is to uphold the PCRA court's findings if they are supported by the record and free of legal error, *see Miller*, 888 A.2d at 629, and focuses on the PCRA court's extensive review of the entire record and the court's adamant conclusion that this review did not shake its confidence in the verdict. Indeed, the Commonwealth notes that the PCRA court did not

even consider this to be a close case, instead characterizing the other evidence against Appellant as overwhelming, a characterization the Commonwealth asserts the record supports.

Examining Appellant's trial testimony, the Commonwealth echoes the PCRA Court's characterization of this testimony as preposterous. The Commonwealth refutes Appellant's argument that his testimony would not have been necessary but for the Commonwealth's suppression of impeachment evidence as to Mr. Wright and Mr. Tribuiani by noting that without Appellant's testimony, he would have been unable to counter Ex-wife's damaging testimony or offer his own defense about the Priest brothers. Therefore, according to the Commonwealth, Appellant had to testify in his own defense or face certain conviction, and, thus, his trial testimony is relevant to our review of the PCRA court's findings.

Our role as an appellate court is to review the PCRA court's conclusion that, even considering the improperly withheld impeachment evidence regarding Mr. Wright and Mr. Tribuiani, Appellant received a fair trial worthy of confidence in the verdict, *see Weiss II*, 986 A.2d at 816, and to determine if this conclusion is supported by the record and free of legal error, *Sepulveda*, 55 A.3d at 1116. After a careful review of the record and the PCRA court's conclusions, we agree with the court that the Commonwealth's evidence against Appellant, independent of the tainted trial testimony of Mr. Wright and Mr. Tribuiani, contained adequate evidence of Appellant's guilt that there is no reasonable probability that if the Commonwealth had turned over the relevant impeachment evidence Appellant would not have been convicted.

In reaching this conclusion we consider Appellant's argument that the *Brady* analysis requires us to disregard his own testimony, which he asserts was made necessary "in large part" by Mr. Wright's and Mr. Tribuiani's unimpeached testimony. As support for this assertion Appellant cites to *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375, where the Court held impeachment evidence falls within the *Brady* rule, and is "evidence favorable to the accused" so that, "if disclosed and used

effectively, it may make the difference between conviction and acquittal." From this sentence Appellant argues that the defense would have effectively used the impeachment evidence to undermine the testimony of Mr. Wright and Mr. Tribuiani and declined to present Appellant to testify in his own defense. Although there is force to the Commonwealth's argument that it would have been in Appellant's interest to testify regardless of whether Mr. Wright and Mr. Tribuiani were impeached by the undisclosed evidence, we will assume *arguendo* the truth of Appellant's assertion and its relevance to a *Brady* materiality analysis. Excluding Appellant's testimony, our review of the remaining evidence presented against Appellant convinces us that he received a fair trial worthy of confidence in the verdict.[12]

Specifically, as the PCRA court observed on remand by this Court, Victim's mother saw Appellant with the victim on the evening she disappeared. When Victim failed to return home, she contacted Appellant, who provided the hitchhiker story. Appellant repeated the hitchhiker story several times to investigating police officers in the months following the disappearance. Neither Victim's Mother nor the investigating police officers observed any injuries to Appellant. When Appellant initially explained his interaction with the victim to Victim's Mother and the investigating officers, he did not mention that he took Victim with him to Mr. Hobart's house. The Commonwealth produced several witnesses who observed Appellant with Victim at Mr. Hobart's house on the evening of October 23, 1978, and characterized their interaction as friendly, and even "cozy," thereby factually contradicting Appellant's explanation as admitted through the testimony of Victim's Mother and the investigating police officers.

The Commonwealth also introduced evidence that following his arrest in 1997, Appellant's explanation of what transpired

12. Although not expressly advocated by Appellant, we also examine the evidence without consideration of Mr. Townsend's testimony, because the Commonwealth called Mr. Townsend only in rebuttal to Appellant's own testimony which, according to Appellant, would not have been offered but for the Commonwealth's suppression of evidence relating to Mr. Wright's and Mr. Tribuiani's credibility.

the night of October 23, 1978, changed, and, for the first time, he repeatedly explained in letters to family members that the Priest brothers likely killed Victim after they assaulted him. This testimony was followed by the testimony of Ex-wife, who testified that she observed blood in the car Appellant had been driving the night Victim disappeared, her homemade red and white quilt was missing from the car, she observed no injuries on Appellant, and he attempted to explain the blood in the car by identifying a scrape on his knuckle. Subsequently, Ex-wife identified the quilt in which the victim's body was found as the handmade quilt that was missing from her car. She also explained that after the victim's body was found, Appellant had the car removed as junk for no apparent reason. She further testified that she never asked her brothers to assault Appellant and she was unaware of any life insurance policy. On cross-examination, Ex-wife conceded that she did not report anything to the police until May 1985. On redirect, she explained that the reason for this delay in reporting to the police was her fear of Appellant, whom she described as violent and brutal. Finally, Mr. Sachweh testified about Appellant's request to contact Victim's Mother to state falsely that Victim was alive and well.

Appellant, on the other hand, had one witness besides himself: Frank Muto, who attempted to cast doubt on whether Ex-wife could positively identify the quilt with which the victim's body was found as the one from her car by testifying that the quilt did not have any identifying marks or tags on it.

We agree that the record supports the PCRA court's holding that the prosecutor's malfeasance notwithstanding, Appellant received a fair trial that resulted in a jury verdict worthy of confidence, *Weiss II*, 986 A.2d at 816 (citing *Kyles*, 514 U.S. at 451, 115 S.Ct. 1555), and that Appellant has not demonstrated "a reasonable probability" that, had the evidence been disclosed to the defense, the result of the trial would have been different, *id.* (citing *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). *See also Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. The reliability of Mr. Wright and Mr. Tribuiani was not determinative of guilt because the Commonwealth presented substantial

evidence of Appellant's guilt that was not undermined by the prosecution's withheld impeachment evidence as to these witnesses. *See Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265, 1272 (1992) ("When the reliability of a witness may be determinative of guilt or innocence, nondisclosure of evidence affecting that witness's credibility" runs afoul of *Brady's* disclosure requirement.). Even if Mr. Wright and Mr. Tribuiani had been fully impeached, the defense was confronted with a victim who was last seen alive with Appellant, a bloody car interior with no credible non-incriminating explanation for the blood, a handmade quilt wrapped around the victim's body that matched the one that had disappeared from Appellant's car the evening he was in the car with Victim, Appellant's suspicious behavior after the disappearance, and his changing explanations. Based on the evidence presented, therefore, we hold that a different result was not reasonably probable with the prosecution's disclosure of impeachment evidence relevant to Mr. Wright and Mr. Tribuiani, and hold that Appellant still received a fair trial resulting in a verdict worthy of confidence.

We distinguish factually the two cases on which Appellant relies: *Breakiron*, 642 F.3d 126, and *Munchinski*, 694 F.3d 308. The issue in *Breakiron* was whether the defendant was guilty of robbery for stealing the victim's purse, where robbery supported the aggravating factor that the defendant committed a murder while in perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). The appellant argued that he was guilty of theft, but not robbery, because he decided to steal from the victim after he killed her. *See* 18 Pa.C.S. § 3701(a)(1) (defining robbery as, *inter alia*, infliction of injury or use of force "in the course of committing a theft"). The only evidence produced by the Commonwealth to support the robbery was from a single witness based on conversations he had with the appellant while the two were incarcerated together, which contradicted the appellant's own testimony. When the appellant later raised a *Brady* claim that the prosecution withheld evidence that he could have used to impeach this witness, the Court of Appeals agreed with the appellant that where there was no other direct evidence about when the appellant formed

the intent to take the money, his own credibility and that of the testifying witness was crucial. Accordingly, the court held the impeachment evidence that the prosecution withheld was material to the robbery charge and its *Brady* violations required relief from the robbery conviction. Unlike the evidence against the appellant in *Breakiron*, which consisted solely of tainted testimony that resulted from the Commonwealth's violation of its obligation to disclose evidence favorable to the accused, the evidence against Appellant did not consist only of tainted testimony by Mr. Wright and Mr. Tribuiani, as explained above.

Similarly, in *Munchinski*, 694 F.3d 308, the Commonwealth secured murder convictions by relying principally on a witness who purported to be an eyewitness to the shootings. The Commonwealth withheld evidence that this witness's trial testimony was markedly different from the pre-trial accounts he provided to police, and additionally withheld factual evidence that demonstrated that the murders could not have happened as this witness described, including evidence that the witness was not even in Pennsylvania when he claimed to have witnessed the shootings. Additionally, although several witnesses testified they heard the defendant confess, the Commonwealth withheld evidence that these witnesses may have had a motive to fabricate this testimony to protect another individual who had previously been identified as the shooter. Finally, the Commonwealth offered another witness who testified that he also heard the defendant confess.

Accordingly, the only evidence against the defendant that did not derive from sources about whom the Commonwealth was simultaneously suppressing impeachment evidence was a jailhouse informant who claimed to have heard the defendant confess, while all of the suppressed evidence contradicted the Commonwealth's own theory of the case. *Munchinski*, 694 F.3d at 337. Indeed, the Commonwealth admitted that the tainted testimony was central to its case. The Circuit Court therefore found that when it considered all of the evidence as a whole, including that which the Commonwealth unlawfully suppressed, "we are convinced that no reasonable juror could

rationally vote to convict." *Id.* Unlike the Circuit Court in *Munchinski,* we do not consider the record from Appellant's trial to be based solely on fabricated evidence or to rest solely on the testimony of a jailhouse informant. Rather, it was based on evidence of Appellant's guilt as admitted through the numerous Commonwealth witnesses.

Therefore, the PCRA court properly denied relief on this claim.[13]

## B. David Townsend

In 1987, Mr. Townsend was arrested and charged along with Appellant for the robbery and assault of James Hoover. At the time Mr. Townsend was a juvenile. He initially faced felony charges, but, upon testifying against Appellant in 1987, the charges were reduced, and in due course he entered into a consent decree receiving one year of probation. In a 1988 letter, Mr. Townsend's Cameron County probation officer stated to the probation department that the consent decree was offered because of Mr. Townsend's cooperation against

13. Appellant also argues that the Commonwealth violated *Brady* by withholding additional impeachment evidence of Mr. Wright's psychiatric history, that two police officers testified falsely that neither Wright nor Tribuiani asked for, expected to receive, or had received any favorable treatment in exchange for the testimony against Appellant, and that counsel was ineffective for failing to impeach Tribuiani with the fact that he had been disciplined in prison for lying to prison officials. Because we have concluded that, based on the evidence presented, a different result was not reasonably probable if the prosecutor had disclosed impeachment evidence relevant to Wright and Tribuiani, these additional assertions do not entitle Appellant to relief.

Similarly, Appellant argues that counsel was ineffective for failing to discover the *Brady* evidence relative to Wright and Tribuiani. We have held, however, that the measure of *Brady* materiality and *Strickland* prejudice is the same: "a grant of relief depends upon finding a reasonable probability that the result of the proceeding would have been different." *Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 417 (2011). Therefore, our resolution of the *Brady* claim dictates the result of the ineffectiveness claim: if the withheld evidence is not material for *Brady* purposes, then the failure to obtain that evidence does not result in prejudice for ineffective assistance purposes. *See Kyles v. Whitley,* 514 U.S. 419, 434, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (equating the prejudice inquiry under *Strickland* with the materiality inquiry under *Brady*); *U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (same).

Appellant in 1987. Mr. Townsend subsequently testified for the Commonwealth in rebuttal at Appellant's murder trial in 1997 that, shortly after he and Appellant had been charged together for the robbery and assault of Mr. Hoover in 1987, Appellant admitted that he had killed a girl. Mr. Townsend stated that he did not tell police about Appellant's confession until the morning of his 1997 trial testimony, and testified that he did not receive a deal to testify against Appellant in the 1987 robbery and assault case.

Appellant argues that the prosecutor violated *Brady* by withholding from the defense two pieces of evidence regarding Mr. Townsend. First, he argues that the prosecutor withheld Mr. Townsend's psychiatric records that indicated a history of psychiatric commitments and treatment, which impeded Appellant's efforts to confront Mr. Townsend's testimony during Appellant's murder trial. Second, Appellant argues that the Commonwealth withheld evidence contained in Mr. Townsend's juvenile court records demonstrating that his 1987 testimony against Appellant was a factor in Mr. Townsend's lenient probationary sentence, and that he testified falsely at Appellant's murder trial in 1997 that he received no benefit for his cooperation against Appellant in 1987.

The Commonwealth argues that there is no evidence that either it or the state police ever had possession of Mr. Townsend's psychiatric records or Cameron County juvenile file. Rather, the psychiatric records were in the possession of Butler Memorial Hospital, and the juvenile record was in the possession of the Cameron County and Armstrong County trial courts, none of which were involved in Appellant's prosecution. *See Commonwealth v. Smith*, 414 Pa.Super. 208, 606 A.2d 939, 941–42 (1992) (holding that psychiatric records not in the Commonwealth's possession but which are held at a treating facility are not discoverable and are privileged absent the consent of the patient). The PCRA court agreed with the Commonwealth, finding no violation of *Brady* with regard to Mr. Townsend's psychiatric or juvenile court records because there was no evidence the prosecutor was in possession of or had access to the records, or that the prosecutor knew that

the Cameron County consent decree was at least in part due to Mr. Townsend's cooperation against Appellant in 1987.

Appellant's allegations of a *Brady* violation relevant to Mr. Townsend fail because a prosecutor's disclosure obligation encompasses only information known or readily ascertainable by the government actors involved in the prosecution. *See Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding that the prosecutor has a duty to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police); *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638, 656 (2009) (holding that the Commonwealth was not required to obtain a pre-sentence report and provide it to the defense where the governmental agency that possessed it was not involved in the prosecution); *Burke*, 781 A.2d at 1142 ("the prosecutor's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.").

The record supports the PCRA court's conclusion that, as to Mr. Townsend's psychiatric records, the Commonwealth was under no obligation to seek out and turn over files in the possession of a psychiatric hospital. Further, Appellant has not attempted to refute the court's finding that the Commonwealth had no knowledge that the consent decree that disposed of Mr. Townsend's juvenile proceedings was in part entered into because of Mr. Townsend's cooperation with the Cameron County district attorney's office during its prosecution of Appellant in 1987. Rather, as the court found, the only facts known to the Commonwealth were that Mr. Townsend had a juvenile conviction and was able to provide information about Appellant's prior assault and robbery conviction, data which the prosecutor obtained by reviewing Appellant's Cameron County trial record, rather than from Mr. Townsend's Cameron County juvenile records. Moreover, Appellant has not demonstrated that Mr. Townsend's Cameron County juvenile record was in the possession of the prosecuting authority (the Office of the Attorney General) or the Pennsylvania State Police. Accordingly, as the Commonwealth was under no

obligation to seek out and turn over files in the possession of a trial court or a hospital that were not involved in Appellant's trial, *Miller*, 987 A.2d at 656, Appellant's *Brady* claims as to Mr. Townsend have no merit.

## II. Conflict of Interest

Appellant's second claim is that trial counsel were ineffective for failing to challenge on direct appeal the trial court's denial of the motion for the appointment of new counsel premised on alleged conflicts of interest resulting from the prior representation by the Public Defender's Office of several individuals.[14] At Appellant's trial, the trial court appointed three public defenders to represent him: Attorneys Donald Marsh, Donald L. McKee, and, as lead counsel, Robert S. Dougherty. These attorneys moved for the disqualification of all members of the Public Defender's Office and for the appointment of new counsel, premised on the prior representation by Attorney Marsh of Commonwealth witness Mr. Wright. The trial court denied the motion without a hearing, and trial counsel did not appeal this denial on direct appeal. In response to Appellant's PCRA petition, the first PCRA court to review the petition concluded that the trial court erred in denying the motion and that the Public Defender's Office had an actual conflict of interest due to simultaneous representation of Appellant and Mr. Wright. On appeal from the grant of relief on this claim, we agreed with the Commonwealth that the issue of whether the trial court erred in denying the motion was waived because counsel did not raise this issue on direct appeal. *Weiss II*, 986 A.2d at 818. Consequently, the only viable claim remaining was counsel ineffectiveness for failing to challenge on direct appeal the propriety of the trial court's pre-trial ruling, and we directed the PCRA court on remand to explore whether Appellant properly raised the ineffectiveness claim. *Id.*

14. Representation by one member of a public defender's office applies to all members of the office. *See Commonwealth v. Westbrook*, 484 Pa. 534, 400 A.2d 160, 162 (1979) (holding that members of the public defender's office would be considered members of the same firm for purposes of a question of conflict of interest in multiple representations).

To aid the PCRA court in addressing a preserved ineffectiveness claim in this regard, this Court rejected the PCRA court's finding that the Public Defender's Office represented Appellant and Mr. Wright simultaneously. *Id.* Rather, we characterized the representation as successive, because the Public Defender's Office began representing Mr. Wright in August 1995; he was sentenced January 15, 1996; and Appellant's trial began one week before Mr. Wright's sentence was to expire. *Id.* We rejected Appellant's argument that trial counsel's representation continues until the client's sentence expires, *id.* ("[w]e do not adopt this view of potentially perpetual assumed representation."), and held that a successful claim rooted in counsel's obligations to former clients requires a petitioner to show that "the conflict of interest adversely affected his counsel's performance." *Id.* (citing *Mickens v. Taylor*, 535 U.S. 162, 174, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)).

On remand, the PCRA court held additional hearings on this issue to supplement those that had already occurred and found that Appellant failed to proffer any evidence that the alleged conflict of interest adversely affected counsel's performance. The court recognized that the basis of the PCRA claim of alleged conflicts was not solely the Public Defender's Office's prior representation of Mr. Wright, but also their prior representation of several other individuals: Mr. Hobart (a Commonwealth witness); Allen Stiles and Paul Strickland, whom Appellant describes as persons of interest during the investigation of Victim's murder; and Steven McClay, whom Appellant refers to as a potential Commonwealth witness. The PCRA court found that as to all of these alleged conflicts, neither Attorney Marsh nor Attorney Dougherty could identify any witnesses who had not been interviewed, questions that had not been asked, or arguments that had not been made because of the purported conflicts. The court therefore found no relief was due on Appellant's ineffectiveness claim.

▇▇ Appellant attempts to overcome the PCRA court's holding in this regard by identifying several lines of questioning as to Mr. Wright and Mr. Hobart which trial counsel did

not pursue at trial. Similarly, Appellant identifies Allen Stiles and Paul Strickland as potential suspects in Victim's murder, and asserts that trial counsel did not inform the jury of this fact at trial. Finally, Appellant asserts that Steven McClay was named in a police report as providing information relevant to the investigation, a fact which trial counsel did not explore at trial. As to all five of these individuals, Appellant asserts that the Public Defender's Office's prior representation of them adversely impacted trial counsels' performance by preventing counsel from pursuing these lines of questioning or exploring these facts at trial. Appellant asserts that trial counsel, who also represented him on direct appeal, were ineffective for failing to challenge on appeal the trial court's denial of the motion for the appointment of new counsel.[15] The Commonwealth responds that the PCRA court's decision to deny relief on this claim is supported by the record and legally correct.

 "A defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice." *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1231 (2006); *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1094

---

**15.** The basis of trial counsels' pre-trial motion for the appointment of new counsel was premised on an alleged conflict as to Mr. Wright, and the only currently viable claim with regard to this alleged conflict is counsel's failure to appeal the trial court's denial of their motion. In contrast, the basis for Appellant's PCRA argument is that counsel labored under a conflict of interest as to four other individuals, who were not mentioned in trial counsels' pre-trial motion. Accordingly, as to these four individuals, the only viable claim is trial counsels' ineffectiveness for failing to alert the trial court of the purported conflicts.

Appellant, however, does not allege trial counsel ineffectiveness for failing to premise the pre-trial motion on the other four individuals. Rather, he instead claims that if the trial court had granted a hearing on the motion, then trial counsel would have also made the trial court aware of the conflicts as to the other four individuals. While this may have been counsel's intent, by failing to make the trial court aware that the basis for the asserted conflict was not just Mr. Wright, but also the four other individuals, Appellant's counsel waived the issue of a conflict as to these four, and Appellant is left with only the derivative claim. We therefore consider Appellant's argument as to Mr. Wright as a failure to appeal the trial court's denial of the pre-trial motion, and the argument as to the other four as a failure to raise the purported conflict before the trial court.

(1998) (citing *Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 38 (1991)).[16] *See also Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 297 (2001) (requiring a post-conviction petitioner to demonstrate that counsel's prior representation of a Commonwealth witness adversely affected counsel's representation of the petitioner).

Appellant has not demonstrated that counsel was actively representing conflicting interests. Similar to *Spotz* and *Hawkins,* this was not a circumstance involving dual representation; rather, any representation by the Public Defender's Office of the five named individuals had terminated prior to their representation of Appellant. As we stated in *Karenbauer,* "[w]here, as here, the record clearly demonstrates that counsel did not actively represent conflicting interests, a claim based on the appearance of a conflict of interest lacks merit." 715 A.2d at 1094.

Additionally, the record supports the PCRA court's conclusion that Appellant has failed to show how the prior representations adversely affected trial counsels' representation of Appellant. Although Appellant asserts that counsel made certain omissions because of the purported conflicts, the PCRA court found no indication that these omissions were caused by a conflict or the prior representations, and Appellant does not explain how the prior representations precluded

16. Although prejudice is presumed when counsel "is burdened by an actual conflict of interest," this presumption applies only where counsel "actively represented conflicting interests." *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1232 (2006) (citing *Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 297–98 (2001)). Although Appellant again attempts to argue that counsel's representation of a client extends through the end of a criminal sentence, so that the Public Defender's Office's representation of its past clients would continue during Appellant's trial and beyond, we rejected this argument in the prior appeal and will not revisit it now. *See Weiss II,* 986 A.2d at 818 (rejecting Appellant's argument of perpetual representation through the expiration of a sentence, and instead requiring Appellant to demonstrate that the conflict adversely affected counsels' performance). *See also Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 251–52 (2008) (providing that an attorney's representation ended at sentencing and requiring a petitioner claiming a conflict from successive representation to demonstrate prejudice).

any of the lines of questioning he believes counsel should have pursued or otherwise affected the trial.

At the PCRA hearing in 2007, Attorney Marsh testified that he was not aware of any witnesses who had not been interviewed, questions that had not been asked, or arguments that had not been made because of the Public Defender's Office's prior representations. Attorney Dougherty did not refute him. PCRA counsel asked Attorney Dougherty how the trial court's denial of the pre-trial motion had affected counsels' representation of Appellant, and Attorney Dougherty was unable to specify anything he did or did not do as a consequence of prior representations. Rather, the only evidence offered in support of a conflict was the bare fact of successive representations. At the PCRA hearing on remand in 2010, Attorney Dougherty still could not say with certainty how the prior representations hampered his representation of Appellant. To the extent counsel declined to pursue particular questioning or could have done more to investigate, this was not because of the alleged conflicts. Accordingly, there is no merit to Appellant's ineffectiveness claim related to the purported conflicts of interest. *See Spotz*, 896 A.2d at 1232 (rejecting a claim based on counsel's representation of an individual which terminated before the appointment to represent the petitioner, because he offered nothing more than bald assertions, with no evidence to suggest that counsel's conduct was due to the alleged conflict of interest); *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1175 (1986) (holding that "[a]ppellant's defense was not prejudiced by the fact that, at a prior time, his counsel had represented a Commonwealth witness").[17]

**17.** Appellant also argues that counsel's failure to investigate or pursue particular lines of questioning, which he attributes to the alleged conflicts, may alternatively have been the result of counsel ineffectiveness. He offers no development of the three prongs of ineffectiveness, relying instead on a bald assertion of ineffectiveness, and further argues that the PCRA neglected entirely to discuss this claim. Although Appellant is correct that the PCRA court did not discuss this claim, it appears this was the result of Appellant's failure to include this claim in his PCRA petition. It is, therefore, waived. *See* Pa.R.A.P. 302(a) (providing that a claim is waived because it cannot be raised for the

### III. Ineffectiveness for Failing to Investigate Alternative Defenses

Appellant's next argument is that trial counsel were ineffective for failing to investigate, prepare, and present the defense of diminished capacity, due to mental defect and voluntary intoxication.[18] In this regard he argues that he had a history of serious head injuries, severe alcohol problems, and cognitive difficulties that could have been presented to demonstrate that he could not form the specific intent to kill. The PCRA court rejected this claim based on Appellant's assertions of complete innocence.

The extremely limited defense of diminished capacity, which encompasses voluntary intoxication and mental defect, is only available to defendants who admit criminal culpability but contest the degree of culpability based upon an inability to form the specific intent to kill. *See Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277 (2011); *Commonwealth v. C. Williams*, 602 Pa. 360, 980 A.2d 510, 527 (2009); *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1131 (2008). We have held that "[i]f a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence of diminished capacity is inadmissible." *Hutchinson*, 25 A.3d at 312; *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 632 (2010); *Spotz*, 896 A.2d at 1218 ("Absent an admission from [the defendant] that he had shot and killed [the victim], trial counsel could not have presented a diminished capacity defense.").

As we recently explained in *Hutchinson*, "[i]n numerous prior cases before this Court, defendants who had maintained their innocence during trial have subsequently raised post-conviction claims of ineffective assistance of trial counsel

first time on appeal); *Commonwealth v. Wharton*, 571 Pa. 85, 811 A.2d 978, 987 (2002).

18. A diminished capacity defense negates the element of specific intent, *see, e.g., Commonwealth v. C. Williams*, 602 Pa. 360, 980 A.2d 510, 527 (2009), and will result in a third-degree murder conviction rather than first-degree. *Commonwealth v. Saranchak*, 581 Pa. 490, 866 A.2d 292, 299 (2005).

for failure to present and/or to investigate a defense of diminished capacity." 25 A.3d at 312–13. As to these claims, "[w]e have consistently declined to hold that trial counsel was ineffective for failing to advance a defense that directly and irreconcilably conflicted with the accused's claims of innocence." *Id.* (collecting cases). Moreover, only a criminal defendant has the authority to concede criminal liability and authorize counsel to present a defense of diminished capacity. *Id.* at 313. Counsel cannot do so over the objections of a client who maintains his innocence. *Commonwealth v. Weaver,* 500 Pa. 439, 457 A.2d 505, 506–07 (1983) (holding that even if diminished capacity was the only viable defense, trial counsel would be deemed ineffective for presenting this defense without the consent of the defendant).

Because Appellant did not concede liability in the murder of Victim, instead maintaining his innocence, a diminished capacity defense was not available, and trial counsel were not ineffective for failing to pursue such a defense. Appellant, however, argues that, despite these limitations on the ability to present this defense, counsel violated a duty to investigate all viable defenses regardless of what the client communicated about the alleged crime. We recently rejected this argument in *Hutchinson,* where trial counsel did not investigate a diminished capacity defense because of the petitioner's assertions of innocence. 25 A.3d at 313–14 (holding that where trial counsel prepared and presented the defense that the petitioner sought based on his claim of non-involvement in the murder, the petitioner failed to establish that trial counsel was ineffective for failing to investigate a diminished capacity defense). *See also Gibson,* 951 A.2d at 1132 ("whether addressing a claim of counsel's failure to investigate or failure to present such defenses, this Court has employed the same analysis"); *Commonwealth v. R. Williams,* 577 Pa. 473, 846 A.2d 105, 112 (2004) ("Moreover, even if counsel had thoroughly investigated Appellant's past, the presentation of a diminished capacity defense would have directly contradicted Appellant's assertions that someone else had committed the crime, and thus would not have been an available defense.").

Here, trial counsel prepared and presented the defense that Appellant sought based on his claim that he was innocent of the murder and his account about the Priest brothers, and counsel further attempted to undermine the Commonwealth's witnesses. The authority to concede liability, which is a prerequisite to a defense of diminished capacity, lies solely with Appellant. As in *Hutchinson,* Appellant has never conceded liability. 25 A.3d at 314 (observing that "even at this stage in the proceedings, Appellant has not conceded any liability for the victim's murder," and holding that he could not, therefore, succeed on his claim of trial counsel ineffectiveness for failing to investigate and pursue a diminished capacity defense). Regardless of trial counsel's investigative efforts, therefore, counsel had no authority to present a diminished capacity defense in the face of Appellant's contrary assertions of innocence, and, as the PCRA court found, Appellant has failed to establish that trial counsel was ineffective for failing to present or to investigate a diminished capacity defense.

## IV. Prior Bad Acts

In his fourth issue, Appellant argues that trial counsel were ineffective for failing to object or request cautionary instructions when the prosecutor elicited testimony of his prior bad acts. He argues that before evidence of prior bad acts is admissible, the Commonwealth must establish an evidentiary foundation for the admission of those acts by, for example, proving that he actually committed the acts to which the various witnesses testified, or testing the credibility of the witnesses. He characterizes each of the prior bad acts evidence as relating to uncharged conduct, unverified allegations, or crimes for which he was not convicted. As discussed below, the specific testimony which Appellant claims the Commonwealth improperly introduced is: Ex-wife's statement that she always found marijuana and beer cans in the car after Appellant had driven it; her characterization of Appellant as brutal and violent; Sandra Spence–Neigh's testimony that Appellant had beaten-up her mother and her; testimony by James Drylie that he had observed marijuana plants growing on Appellant's property; testimony by Appellant's sister (Janet

Hastings) that Appellant commented that the police wanted to talk to him, but they would never lock him up because he would shoot them if they knocked on his door; David Townsend's testimony that Appellant hit James Hoover over the head with a tire iron; and Mr. Townsend's testimony that he did not tell police about the assault on Mr. Hoover for fear of reprisals.

The Commonwealth responds that each instance of prior bad acts was relevant and admissible, and there was no basis for counsel either to object or request a cautionary instruction, thereby drawing further attention to the testimony. The PCRA court rejected this claim, finding that two of the statements were not related to prior bad acts and were admissible for other, valid purposes, and concluding that even assuming that the other statements were objectionable, Appellant suffered no prejudice from their admission. The court concluded that any error by trial counsel for not objecting or requesting a cautionary instruction does not entitle Appellant to relief.

██ The PCRA court's rejection of this claim is supported by the record and free from legal error. Evidence of prior bad acts is inadmissible to prove character or to show conduct in conformity with that character. *Commonwealth v. Busanet*, 618 Pa. 1, 54 A.3d 35, 60 (2012); *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 497 (2009); Pa.R.E. 404(a)(1). Such evidence is, however, admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 534 (2005); Pa.R.E. 404(b)(2). We have also recognized that prior bad acts evidence may be admissible as *res gestae* when relevant to furnish the complete story or context of events surrounding the crime. *See Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 539 (2006) ("This Court has recognized exceptions to Rule 404, for which evidence of other crimes may be introduced, including the *res gestae* exception which allows 'the complete story' to be told." (citing *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 308

(2002))); *Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491, 497 (1988) ("evidence of other crimes may be relevant and admissible [ ] where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts."). *See also Commonwealth v. Spruill,* 480 Pa. 601, 391 A.2d 1048, 1050 (1978) (recognizing that there are exceptions to the rule that reference to prior bad acts is error "where there is a legitimate basis for the introduction of the evidence other than a mere attempt to establish the accused's predisposition to commit the crime charged.").

▉▉▉▉ However, while evidence of prior bad acts may be relevant and admissible, there is the "potential for misunderstanding on the part of the jury when this type of evidence is admitted." *Commonwealth v. Claypool,* 508 Pa. 198, 495 A.2d 176, 179 (1985). This evidence must, therefore, "be accompanied by a cautionary instruction which fully and carefully explains to the jury the limited purpose for which that evidence has been admitted." *Id.* In the context of an ineffectiveness claim, counsel's failure to request a cautionary instruction regarding evidence of other crimes or prior bad acts does not constitute *per se* ineffectiveness; "[r]ather, in order to obtain relief under such a claim, a defendant must still satisfy each of the three prongs of the test for ineffective assistance of counsel." *Commonwealth v. Buehl,* 540 Pa. 493, 658 A.2d 771, 778 (1995) (plurality). With regard to the reasonable basis prong of this test, it is incumbent on the petitioner to demonstrate that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. *See, e.g., Chmiel,* 889 A.2d at 547 (holding that based on trial counsel's PCRA testimony, counsel had a reasonable basis for declining to request a limiting instruction). When the petitioner is granted a PCRA hearing, it is his burden to satisfy this aspect of the test with direct questioning of trial counsel. *See Commonwealth v. Koehler,* 614 Pa. 159, 36 A.3d 121, 146 (2012) (faulting a PCRA petitioner for declining to question trial counsel at the PCRA hearing about the lack of a strategic basis for failing to object).

■ Addressing the argument that trial counsel was ineffective for failing to object, four of the statements may be dealt with together. First, Ex-wife offered her statement that she always found marijuana and beer cans in the car after Appellant had driven it to explain why she cleaned out the car on October 24, 1978. Second, she characterized Appellant as brutal and violent to explain that she was afraid of him, and why she waited until she was no longer married to come forward to the police with her observations. Third, Sandra Spence–Neigh, Appellant's niece, testified that in late October 1979, Ex-wife told her that she found blood in the back seat of the car she shared with Appellant. Defense counsel cross-examined her and attempted to highlight an inconsistency between her trial testimony and a 1979 statement she gave to police in which she stated that Ex-wife told her she found "a spot of blood" in the car. N.T., 7/7/1997, p. 554. To explain this inconsistency, on re-direct, Ms. Spence–Neigh stated that when she gave the 1979 statement she was upset because Appellant had just beaten up her mother and her. Fourth, during David Townsend's testimony, he stated that he feared Appellant. The basis of this fear was Appellant's threat that if Mr. Townsend did not keep quiet about Mr. Hoover, he would end up like Victim.

The PCRA court did not err in holding that any prejudice from these fleeting references was minimal, because the prosecutor did not dwell on them during examination or closing argument, and they therefore fail to satisfy the prejudice necessary to prevail on an ineffectiveness claim. Moreover, as the Commonwealth argues, the statements were also relevant for *res gestae* purposes; that is, to explain the events surrounding the discovery of evidence and the delay in reporting this evidence. Additionally, Ms. Spence–Neigh's comment was a proper response to the defense's attempt to undermine her credibility, and was therefore admissible in rebuttal to dispel inferences raised by the defense. *See, e.g., Commonwealth v. Saxton,* 516 Pa. 196, 532 A.2d 352 (1987) (holding that where the defendant "opened the door" to the admission of prior bad acts, counsel was not ineffective for stipulating

thereto). Further, counsel noted in the PCRA hearing that a reason not to object to such comments is to avoid drawing further attention to them, a rationale which is entirely reasonable. N.T., 3/29/2007, p. 113; *see Commonwealth v. Hutchinson*, 571 Pa. 45, 811 A.2d 556 (2002) (holding that where evidence of a defendant's prior bad acts is a fleeting or vague reference, trial counsel might reasonably decline to object to avoid drawing attention to the reference that might otherwise have gone relatively unnoticed by the jury). Accordingly, the PCRA court properly denied relief on this basis.

The Commonwealth offered testimony by James Drylie that he had observed marijuana plants growing on Appellant's property to corroborate earlier testimony by Mr. Tribuiani that when Appellant told him he killed the victim, the motive was because "she was going to tell on their sex parties and they were in some kind of weed business or whatever." N.T., 7/7/1997, p. 557. Mr. Drylie testified that he observed the plants beneath a trailer on Appellant's property, and surmised that Appellant knew they were there. When the prosecutor asked Mr. Drylie if he had any reason to know the plants belonged to Appellant, the witness responded that he did not. On cross-examination, the witness stated that the plants could have belonged to Appellant's friends. The PCRA court found Appellant was not prejudiced by this testimony. Additionally, and contrary to Appellant's assertion, trial counsel did, unsuccessfully, object to Mr. Drylie's testimony, rendering the only viable claim of trial counsel ineffectiveness in this regard counsel's failure to request a cautionary instruction, which is addressed below. *Id.*, p. 570.

 Janet Hastings's recollection of statements made by Appellant was provided in response to questioning about whether she had ever discussed the murder investigation with him in 1978. She stated that she had, and relayed a conversation she had with Appellant, her brother, when he stated that the police were "bothering" him about Victim's whereabouts. Ms. Hastings testified that she advised Appellant to talk to them in order to clear his name. In response, Appellant

stated that the police would never lock him up because he would shoot them if they knocked on his door.

The PCRA court found that this statement was not admitted as evidence of prior bad acts, but was instead admissible as an admission by a party opponent, *see* Pa.R.E. 803(25), because Appellant and Ms. Hastings were discussing Victim's disappearance, Appellant's comment that the police were bothering him indicated that he was aware the police suspected his involvement, and his threat to shoot the police made it likely he understood his own culpability for the murder. The record supports the PCRA court's holding that this statement was not admitted to demonstrate Appellant's propensity to act in conformity with a negative character trait. *See* Pa.R.E. 404(a)(1) (precluding the use of evidence of a person's character or character trait to prove that on a particular occasion the person acted in accordance with that character trait). Rather, Ms. Hastings's statement that Appellant threatened to shoot the police if they knocked on his door was a prior statement by Appellant of his future intent. A defendant's threat of another is a voluntary extrajudicial statement that can be used against the defendant at trial, even though the threat contains no clear admission of guilt of the offense prosecuted. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 635 (1995) ("voluntary extrajudicial statements made by a defendant may be used against a defendant even though they contain no admission of guilt." (citing *Commonwealth v. Tervalon,* 463 Pa. 581, 345 A.2d 671, 676 (1975))).

Turning to David Townsend, he testified that Appellant hit James Hoover with a tire iron. This testimony was offered in rebuttal to Appellant's own testimony that he was not capable of striking someone with a tire iron. *See Weiss I,* 776 A.2d at 967 (observing Appellant's testimony that he would never do something like taking a crowbar or a tire iron and striking someone in the head with it, and Mr. Townsend's rebuttal to this assertion, and concluding that "the testimony of David Townsend was clearly introduced to rebut assertions made by Weiss during his cross-examination, [and] the evi-

dence was properly admitted."). Consequently, Appellant opened the door to this testimony, letting it in not to demonstrate his propensity to commit bad acts, but to rebut Appellant's own testimony.

Each of the instances of prior bad acts were either: admissible for a legitimate reason; subject to counsel's reasonable basis not to object; or were fleeting and not dwelled upon. Therefore, Appellant's claim that counsel provided ineffective assistance by failing to object is not persuasive, and the record supports the PCRA court's rejection of relief on this claim.

 Nor is Appellant entitled to relief on the claim that counsel was ineffective for failing to request a cautionary instruction. During the PCRA proceedings, Appellant's counsel questioned trial counsel about the reason for declining to request a cautionary instruction with regard to the testimony of his niece, Ms. Spence–Neigh. Counsel responded that a legitimate reason not to request an instruction in such circumstances was to avoid further calling attention to the testimony. *See* N.T., 3/29/2007, at 113 ("if . . . I didn't object or ask for the instruction because I didn't want it to be brought to the attention of the jury."). As to this particular testimony, therefore, Appellant's claim fails because counsel had a reasonable basis not to object.

As to the other instances of prior bad acts, Appellant does not address the reasonable basis prong of the ineffectiveness test with regard to trial counsel's failure to request cautionary instructions; rather, he baldly asserts that "there was absolutely no tactical or strategic justification for [the failure to request a limiting instruction]." Appellant's Brief at 48.

As noted, however, an evidentiary hearing was conducted before the PCRA court, and Appellant was afforded the opportunity to present evidence in support of his claims. Nevertheless, Appellant has not indicated where in the PCRA proceedings he queried counsel about the lack of a cautionary instruction, and our own review has not established he did so as to the other instances of prior bad acts testimony (other than in regard to Ms. Spence–Neigh). *See Commonwealth v.*

*Lesko,* 609 Pa. 128, 15 A.3d 345, 401 (2011) (providing that a petitioner is required by Pa.R.A.P. 2119 and 2132 to direct the court's attention to the relevant section of the record necessary to assess a claim). By failing to ask counsel about his strategy, Appellant has not carried his burden of proving that counsel lacked a reasonable basis. *See id.,* (faulting a PCRA petitioner raising a claim of ineffectiveness for failing to request a cautionary instruction as to prior bad acts for not supporting the claim by "point[ing] to the part of the PCRA hearing record which shows that trial counsel was asked and explained why he did not request a cautionary instruction.").

Moreover, the lack of a strategic basis for failing to object is not self-evident. Consistent with trial counsel's PCRA testimony as to Ms. Spence–Neigh, we have recognized that under some circumstances, trial counsel may forego seeking a cautionary instruction on a particular point because "[o]bjections sometimes highlight the issue for the jury, and curative instructions always do." *Koehler,* 36 A.3d at 146; *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 832 (2005).

Because Appellant was given an evidentiary hearing and yet did not elicit from trial counsel his reasons for failing to request the cautionary charge, and because the decision whether to seek a jury instruction implicates a matter of trial strategy, *Lesko,* 15 A.3d at 401, the record before us provides no grounds for deeming counsel ineffective for failing to request an instruction. *See Koehler,* 36 A.3d at 147 (rejecting an ineffectiveness claim premised on counsel's failure to request cautionary instructions because the petitioner did not ask trial counsel about his strategy at the PCRA hearing); *Commonwealth v. Puksar,* 597 Pa. 240, 951 A.2d 267, 278 (2008) (rejecting an ineffectiveness claim because, *inter alia,* PCRA counsel failed to question trial counsel during the PCRA hearing regarding his trial strategy for not calling a particular witness); *Commonwealth v. Ervin,* 766 A.2d 859 (Pa.Super.2000) (rejecting claim challenging trial counsel's failure to object to the prosecutor's questioning and argument on the reasonable basis prong of the ineffectiveness test because the PCRA petitioner was afforded an evidentiary hearing, but

failed to question trial counsel regarding his trial strategy as it related to the claim of ineffectiveness).

## V. Prosecutorial Misconduct

In his fifth issue, Appellant alleges numerous instances of prosecutorial misconduct to which trial counsel failed to object. The PCRA court held these claims were previously litigated because each of the challenged remarks were raised and litigated by counsel on appeal, and we addressed and rejected each on the merits. *Weiss I*, 776 A.2d at 968–70 ("As our review of the entire argument reveals that none of the claimed improper statements alone, or cumulatively, had the unavoidable effect of prejudicing the jury and forming in their minds fixed bias and hostility towards Weiss that would prevent them from properly weighing the evidence and rendering a true verdict, no relief is due on his claim of improper prosecutorial argument.").

Although we disagree with the PCRA court that the precise claims before us in this PCRA proceeding have been previously litigated, because they are currently presented in terms of trial counsel ineffectiveness for failing to object to the instances of prosecutorial misconduct, as distinct from the merit of the underlying claim, *see Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564 (2005) (providing that a claim of ineffectiveness is distinct from the underlying issue), we agree that Appellant is not entitled to relief. To carry his burden, Appellant is required to show, *inter alia*, that the underlying claims have arguable merit. *Pierce*, 527 A.2d at 975. As noted in our prior opinion in *Weiss I*, Appellant was unable to succeed on the merits of his arguments of prosecutorial misconduct for the same remarks that form the basis for the current ineffectiveness claims. Accordingly, because Appellant was not entitled to relief on the claim of prosecutorial misconduct, he has failed to demonstrate the arguable merit of his derivative claim of trial court ineffectiveness for failing to object to the prosecutor's comments.

## VI. Right of Confrontation and to Present a Defense

■ Appellant next claims that the trial court improperly limited trial counsel's cross-examination and that he was therefore denied "his rights to confrontation and to present a defense." Appellant's Brief at 52. The PCRA court held this claim was presented solely in terms of trial court error, and that it was, therefore, waived pursuant to 42 Pa.C.S. § 9544.

The PCRA court is correct. Appellant did not challenge the trial court's rulings in post-sentence motions or on direct appeal, therefore waiving his issue of trial court error. Moreover, he does not challenge trial counsels' error in this regard.[19] Accordingly, any claim related to trial counsel ineffectiveness for failing to object is waived, and Appellant is not entitled to PCRA relief. 42 Pa.C.S. § 9543(a)(3) (providing that to be eligible for PCRA relief, a petitioner must prove "[t]hat the allegation of error has not been previously litigated or waived."); id., § 9544(b) (providing that an issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding.").

## VII. Counsel Ineffectiveness

In his seventh issue, Appellant asserts that trial counsel were ineffective in several respects.

### A. Ineffectiveness for failing to uncover evidence regarding David Townsend

■ In the first argument, discussed above, Appellant argued that the Commonwealth violated *Brady* by failing to turn over certain evidence regarding David Townsend to the defense. Appellant now argues that counsel were ineffective for failing to uncover this evidence, specifically, David Townsend's juvenile and psychiatric records for purposes of im-

19. Although Petitioner presents to this Court an argument that counsel was ineffective for failing to raise on appeal the trial court's limitation of trial counsel's cross-examination, he did not raise this issue to the PCRA court, and it is, therefore, waived. *See* Pa.R.A.P. 302(a) (providing that a claim is waived because it cannot be raised for the first time on appeal); *Commonwealth v. Wharton*, 571 Pa. 85, 811 A.2d 978, 987 (2002).

peachment. Although this claim is substantially undeveloped in his brief to this Court, it is apparent that the PCRA court's legal analysis rejecting this claim was proper.

The PCRA court held that the use of juvenile records is subject to Section 6354 of the Juvenile Act, which bars admission of juvenile records for any purpose other than those provided in the statute, none of which includes impeachment in a criminal trial.[20] Appellant has not addressed the PCRA court's legal holding in this regard, offering nothing but bald assertions of ineffectiveness. Because Section 6354 supports the PCRA court's holding that Townsend's juvenile record was not admissible at Appellant's trial for purposes of impeachment, and Appellant offers no argument that he was otherwise prejudiced by counsel's failure to obtain it, he has failed to demonstrate the prejudice prong of this ineffectiveness claim. *See Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987) (requiring a petitioner to prove how the alleged ineffectiveness prejudiced him).

 The PCRA court reached the same result with respect to Appellant's assertion that trial counsel was ineffective for failing to obtain Townsend's psychiatric records. The court held that pursuant to two Superior Court cases, the psychiatric records would only be admissible in limited circumstances, neither of which were applicable to Appellant's trial. *See Commonwealth v. Smith*, 414 Pa.Super. 208, 606 A.2d 939 (1992) (holding that psychiatric records not in the Commonwealth's possession, but held at the treating facility, were

**20.** This section provides that a juvenile's disposition may only be used against him:

(1) in dispositional proceedings after conviction for the purposes of a presentence investigation and report if the child was adjudicated delinquent;

(2) in a subsequent juvenile hearing, whether before or after reaching majority;

(3) if relevant, where he has put his reputation or character in issue in a civil matter; or

(4) in a criminal proceeding, if the child was adjudicated delinquent for an offense, the evidence of which would be admissible if committed by an adult.

42 Pa.C.S. § 6354.

"absolutely privileged and shielded from discovery, absent the consent of the parties."); *Commonwealth v. Kyle,* 367 Pa.Super. 484, 533 A.2d 120, 131 (1987) (holding that psychiatric records are privileged even from *in camera* review). Appellant offers no argument to refute the PCRA court's holding in this regard. Moreover, Appellant did not argue to the PCRA court that the psychiatric records were either in the Commonwealth's possession or that Townsend would have consented to their release, and therefore has no basis for this ineffectiveness claim. Even if counsel had discovered the existence of these records, they would not have been able to obtain them, and Appellant was therefore not prejudiced by counsel's failure to uncover them.

### B. Ineffectiveness for failing to impeach the Commonwealth's pathologist

Appellant argues that trial counsel were ineffective for not impeaching the Commonwealth's forensic witness, who testified that Victim was hit on the head at least two and possibly three times, with the report of Dr. Cottle, who performed the autopsy in 1978 and concluded that the victim died as the result of a single blow to the head. Appellant also argues that trial counsel should have retained a defense expert to challenge the Commonwealth's evidence regarding the number of blows. The PCRA court held that Appellant could not prevail on his claim of counsel ineffectiveness for not impeaching the Commonwealth's expert with Dr. Cottle's autopsy report because it was inconsequential to Appellant's trial strategy whether the victim received one, two, or three blows to the head. With regard to Appellant's assertion that defense counsel should have obtained an expert to challenge the Commonwealth's evidence regarding the number of blows, the PCRA court held that Appellant presented no evidence that an independent expert would have contradicted the Commonwealth's evidence in this regard.

The PCRA court's rejection of this ineffectiveness claim is supported by the record and free from legal error. Appellant's defense at trial was to attribute guilt to the Priest

brothers; a defense concerning the number of blows Victim sustained was immaterial. Appellant has not, therefore, demonstrated the merit to his claim of counsel ineffectiveness for failing to challenge the Commonwealth's forensic evidence.

Similarly, as the PCRA court held, Appellant did not substantiate his assertion that defense counsel should have obtained an expert witness to challenge the Commonwealth with respect to the number of blows, by, for example, presenting evidence that such a witness existed and would have contradicted the Commonwealth's evidence. *See Commonwealth v. Chmiel,* 612 Pa. 333, 30 A.3d 1111, 1143 (2011) (providing that to establish ineffectiveness for failing to call an expert witness, an appellant must establish that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant.); *Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456, 470 (1998) (same). This claim, therefore, fails on the merits. Additionally, regardless of the number of blows, the extent of the injury was sufficient to prove malice.

### C. Ineffectiveness for failing to request a polluted source instruction

Appellant next argues that trial counsel were ineffective for failing to request a "corrupt and polluted source" instruction with regard to the testimony of David Townsend. *See e.g., Commonwealth v. Chmiel,* 536 Pa. 244, 639 A.2d 9, 13 (1994) ("It is well established that in any case where an accomplice implicates the defendant, the judge should tell the jury that the accomplice is a corrupt and polluted source whose testimony should be viewed with great caution."). As the PCRA court found, however, Townsend was not an accomplice to the crimes for which Appellant was on trial. Rather, he was an accomplice to the 1987 assault of James Hoover. We have never held that an accomplice means any person who has ever aided in the commission of any crime the defendant may have committed; instead, an accomplice is one who aids in the commission of the crime for which the defendant is on

trial. *See Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1181 (1999) (holding that the corrupt source charge is appropriate when the evidence is sufficient to present a jury question about whether a witness could be indicted for the crime for which the accused is charged). Accordingly, trial counsel had no legal basis to request such an instruction.

### D. Ineffectiveness for failing to present testimony from James Hoover

▆ Appellant asserts that following his conviction for assaulting James Hoover, Mr. Hoover wrote a letter to the prosecutor of that conviction stating that "others involved did not tell the truth." Appellant asserts that the only person to whom this letter could refer is David Townsend, and that trial counsel was therefore ineffective for failing to call Mr. Hoover as a defense witness to rebut Mr. Townsend.

The PCRA court held that Appellant did not meet his burden of proving counsel ineffectiveness for failure to call this witness. *See Chmiel,* 30 A.3d at 1143 (providing that a defendant asserting an ineffectiveness claim premised on counsel's failure to call a witness must demonstrate, that the proposed witness existed and was available, counsel knew of or should have known of the witness, the witness was willing and able to cooperate and appear on the petitioner's behalf, and the petitioner was prejudiced because the witness did not testify). The record supports this conclusion. The only thing Appellant offered was the 1989 letter, which did not say that Townsend was lying during the assault investigation and trial, did not prove that Mr. Hoover was available in 1997 or would have testified on Appellant's behalf, and did not prove that counsel knew or should have known about this letter. Accordingly, this claim does not entitle Appellant to relief.

### E. Ineffectiveness for failing to object to hearsay testimony

Appellant argues counsel were ineffective for failing to object to hearsay testimony by State Trooper Jakela that he received an anonymous telephone call stating that Appellant had given Victim a ride home the night she disappeared; a

728

statement by Victim's Mother that she received a telephone call two days after the disappearance in which the caller informed her the victim was at Appellant's home; and testimony by Ms. Spence–Neigh that she spoke to Ex-wife, who stated that she had observed blood in Appellant's car the morning after the disappearance.

The record supports the PCRA court's rejection of this claim. Two of the three statements were not offered for their truth, and therefore, were not, as Appellant argues, hearsay. *See* Pa.R.E. 801 (defining hearsay as a statement offered into evidence to prove the truth of the matter asserted). They were instead offered for different reasons. Trooper Jakela's testimony was provided in response to the prosecutor's question about what had prompted his interview with Appellant. Trooper Jakela responded that he had received an anonymous telephone call informing him that Appellant was with Victim the night she disappeared. The prosecutor, therefore, did not offer this testimony to prove the truth of the anonymous caller's report that Appellant had been with Victim that night, but to explain that Trooper Jakela's receipt of this information prompted him to interview Appellant. *See Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 532 (2005) ("[i]t is well established that certain out-of-court statements offered to explain the course of police conduct are admissible because they are offered not for the truth of the matters asserted but rather to show the information upon which police acted."). Similarly, Victim's Mother's statement that she received information in a telephone call that the victim was at Appellant's home was offered not for the truth of whether Victim was truly in that location, but to explain why Victim's Mother drove to Appellant's home looking for her daughter. Trial counsel, therefore, had no basis to lodge an objection to these two statements, and Appellant's ineffectiveness claim in regard to these statement fails for want of arguable merit.

Ms. Spence–Neigh's statement, however, does appear to be hearsay, because the only reason it was offered was to corroborate the testimony of Ex-wife about the blood she

found in the car. Appellant, however, has demonstrated neither the reasonable basis or prejudice prongs of the asserted ineffectiveness. When Appellant was given the opportunity to question trial counsel about his reasons for failing to object at the PCRA hearing, he did not do so. *See Lesko,* 15 A.3d at 401 (holding that where a PCRA petitioner failed to ask trial counsel about an omission when provided with the opportunity to do so at a PCRA hearing, the petitioner failed to demonstrate the reasonable basis prong of ineffectiveness). Moreover, the PCRA court's holding that Appellant was not prejudiced by trial counsel's failure to object to this testimony is supported by the record. Ms. Spence–Neigh's testimony was cumulative of Ex-wife's description of the car. Because this hearsay statement corroborated properly admitted testimony by Ex-wife, and because of the independent evidence of Appellant's guilt, we cannot say that the PCRA court erred when it held that Ms. Spence–Neigh's testimony did not affect the verdict. *See Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 441 (1999) (holding that to establish prejudice, a petitioner must demonstrate that "but for the act or omission in question, the outcome of the proceedings would have been different.").

### F. Failure to present evidence of Larry Priest's past convictions

■■■ Appellant asserts that at the time of his trial, Larry Priest had a conviction for assaulting a man with a claw hammer, and argues that counsel should have moved into evidence the court records of this conviction to support Appellant's testimony that he too had been assaulted by Mr. Priest.

The PCRA court rejected this claim, holding that although a defendant is entitled to admit evidence tending to show that another person committed the crime for which the defendant is on trial, *see Commonwealth v. Thompson,* 779 A.2d 1195 (Pa.Super.2001) (holding that other crimes evidence is admissible to show that someone else committed the crime charged), Appellant did not claim counsel should have produced the evidence of Mr. Priest's assault conviction to prove that Mr.

Priest killed Victim, but to bolster his own testimony about being assaulted. According to the PCRA court, this evidence was inadmissible to bolster credibility, and trial counsel were not ineffective for failing to introduce it.

"It is well established that evidence which tends to show that the crime for which an accused stands trial was committed by someone else is relevant and admissible." *Commonwealth v. McGowan*, 535 Pa. 292, 635 A.2d 113, 115 (1993). In this regard, "the defense may introduce evidence that someone else committed a crime which bears a highly detailed similarity to the crime with which the defendant is charged." *Id.* (citing with approval *Commonwealth v. Rini*, 285 Pa.Super. 475, 427 A.2d 1385 (1981)). The PCRA court's holding that Appellant did not seek to introduce this evidence to demonstrate that Mr. Priest killed the victim, but to corroborate his own testimony that Mr. Priest assaulted him, is supported by the record. Appellant did not develop that the crime for which Mr. Priest was convicted bore substantial similarity to Victim's murder. In addition, Appellant did not offer trial counsel an opportunity to explain his chosen course of action when trial counsel testified at the PCRA hearings. Accordingly, Appellant is not entitled to relief on this aspect of his ineffectiveness claim.

## VIII. Change of Venue

Prior to trial, counsel moved for a change of venue due to pre-trial publicity of the victim's murder and Appellant's arrest. At a pre-trial hearing, the trial court denied the motion, but stated that it would reconsider it during *voir dire*. *Voir dire* proceeded, and a jury was chosen. According to Appellant, *voir dire* indicated that half of potential jurors were familiar with the case, and that five of the twelve jurors had either read about the murder or heard about it. On direct appeal, we considered and rejected the argument that the trial court erred when it denied the pre-trial motion for change of venue. *Weiss I,* 776 A.2d at 964.

Appellant currently argues that he and the victim's murder were the subject of massive news coverage so pervasive that we should presume prejudice, that the trial court erred in denying the pre-trial motion for change of venue, and that counsel was ineffective for failing to litigate this motion adequately, for failing to question the jurors about their exposure to the publicity, and for failing to support the argument of trial court error on appeal to this court with five newspaper articles on which he now relies. Specifically, Appellant relies on newspaper articles from February 21, 1997, to July 6, 1997, which he asserts informed potential jurors inaccurately that he had a record for violence and had confessed to two people; that the Commonwealth had a strong case against him; that he was in jail when he was arrested; and that he had committed a prior murder.

Because we considered and rejected a claim on direct appeal premised on the trial court's denial of the pretrial motion, the only viable claim is of counsel ineffectiveness. A defendant is guaranteed the right to an impartial jury, *Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and a jury's exposure to inadmissible evidence violates due process. *Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). For pre-trial publicity to be presumptively prejudicial, a defendant must prove, *inter alia*, "that the publicity must be so extensive, sustained, and pervasive without sufficient time between publication and trial for the prejudice to dissipate, that the community must be deemed to have been saturated." *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1141 (1996).

The PCRA court held that Appellant did not satisfy this burden, and was not entitled to the presumption of prejudice. The record supports this holding. The newspaper articles occurring on five dates over four and a half months do not suggest community saturation; a conclusion that is reinforced by the jury that was selected for Appellant's trial. As we observed on direct appeal:

Additionally, we have independently reviewed the entire 340–page transcript of the voir dire proceedings for evidence that pretrial publicity resulted in actual prejudice, and have found no such evidence. Fifty-five prospective jurors were questioned about their knowledge of the case and, of these, twenty-six had been exposed to no news accounts of the case and had absolutely no knowledge of the case. Of the thirteen people ultimately selected to serve on the jury, eight had heard nothing of the case, one person had read something about the case the day prior to voir dire, one had seen something in the newspaper within the prior few weeks, one had seen something in the newspaper within a few months, one had read something about the case at some point in the past, and finally, one juror had heard it spoken of nine years prior. All thirteen stated with clarity that they would be able to make their decision in the case based solely on the evidence produced in the courtroom. Based on this record, we conclude that pretrial publicity did not result in prejudice in empanelling the jury and that the trial court did not abuse its discretion in denying the motion of Weiss for a change of venue.

*Weiss I*, 776 A.2d at 965. The record, and our prior holding, suggests that the community was not saturated with prejudicial publicity, and that Appellant was not, in fact, prejudiced by any media attention. Accordingly, there is no merit to Appellant's claims of trial counsel ineffectiveness for failing to question jurors about their exposure to publicity and for failing to litigate the claim of trial court error with the newspaper articles on which he now relies.

## IX. Pre-arrest Delay

■ Appellant's next issue is premised on the length of time between the 1978 murder and his 1997 trial. The Commonwealth initially filed charges against Appellant in 1985 when Ex-wife came forward with her statement that she found blood in the back of the car the morning after Appellant and Victim had been in the car, but the charges were dismissed upon the trial court's ruling that Ex-wife was incompe-

tent to testify against Appellant because of spousal privilege. A grand jury was empaneled in 1993, but did not return an indictment. The prosecution reviewed the case in 1995 and concluded it did not have sufficient evidence to bring charges against Appellant. Appellant finally was charged with the murder in February 1997.

Appellant argues that the Commonwealth's delay in waiting until 1997 to charge him violated his right to due process and prejudiced him by depriving him of the opportunity to call his mother as a defense witness, who Appellant asserts could have verified his injuries (purportedly inflicted by the Priest brothers), but who died in 1991, and of the opportunity to test forensically the car or beer cans that were found near the victim's body. He argues counsel were ineffective for failing to present this argument to the trial court.

To establish a due process violation resulting from a delay in prosecution, a defendant must prove that the passage of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for the delay. *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596, 601 (1998).

There is no merit to Appellant's claim that the prosecutor lacked sufficient reasons for the delay, and the PCRA court's rejection of this claim is supported by the record and free of legal error. The court held that until 1985, when Ex-wife came forward to cooperate with police, the Commonwealth lacked sufficient evidence to bring charges against Appellant. After Ex-wife provided her statement, they arrested Appellant, only to have to *nolle pross* the charges because the trial court held Ex-wife was incompetent to testify. It is apparent, therefore, that at least until 1989, when the spousal privilege law changed, the Commonwealth had valid reasons for not prosecuting Appellant.

Moreover, the facts on which Appellant relies to assert that prejudice resulted from the Commonwealth's delay occurred prior to 1989. By the time Ex-wife came forward in 1985, the car was not accessible for forensic testing because Appellant gave it to a junkyard shortly after the victim's body was

discovered. Similarly, although Appellant claims he could have tested the beer cans, the Commonwealth processed the cans for fingerprints with negative results, and the cans were no longer available in 1989. Therefore, any delay after 1989 did not add to the prejudice which Appellant claims he suffered as a result of the delay. Further, there is no indication that access to the beer cans would have produced exculpatory results.

With regard to the role of his mother, any prejudice Appellant suffered due to her death was the result of Appellant's own actions during the investigation. Although Appellant was initially arrested in 1985, he did not mention the alleged role of the Priest brothers at that time. Had he done so, as the PCRA court observed, the police could have questioned his mother to determine if she corroborated the existence of the injuries Appellant claimed to have sustained at the hands of the Priest brothers.

Because the record supports the PCRA court's decision that the Commonwealth possessed sufficient and proper reasons to delay the prosecution at least until the amendment of the law governing spousal privileges in 1989, and because the prejudice that Appellant claims resulted from the death of his mother could have been ameliorated if he had told the police prior to 1991 about the alleged role of the Priest brothers, there is no merit to the argument that counsel was ineffective in failing to object, at trial, to the delay in prosecuting him.

## X. Cumulative Prejudice

Appellant's final claim is that cumulative errors so undermined the fairness of the trial that the conviction must be vacated. Although this Court has repeatedly emphasized that no number of failed claims may collectively warrant relief if they fail to do so individually, *Rainey*, 928 A.2d at 245, we have more recently recognized that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Commonwealth v. Sepulveda*, 618 Pa. 262, 55 A.3d 1108, 1150 (2012); *see also Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532

(2009); *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994). We cited a lack of prejudice as the sole reason the following claims failed: the *Brady* claim, the conflict claim, and the ineffectiveness claims related to Mr. Townsend's juvenile and psychiatric records. We are confident that there is no cumulative error warranting relief. *Cf., e.g., Lesko*, 15 A.3d at 417 (holding that the notion of cumulating prejudice does not easily flow from the disposition of disparate claims).

For the reasons stated herein, we affirm the order of the PCRA Court denying guilt-phase relief. Jurisdiction relinquished.

Justice STEVENS did not participate in the consideration or decision of this case.

Justices TODD and McCAFFERY join the opinion.

Justice SAYLOR joins the majority opinion, except Part IV, as to which he concurs in the result.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, with the exception of the resolution of appellant's *Brady*[1] claim respecting Commonwealth witnesses Wright and Tribuiani. In arguing *Brady* materiality, appellant advocates for an expansion of *Brady* that would place his own trial testimony—inconsistent and implausible, and deemed "incredible" by the PCRA[2] court— off limits from analysis. He argues for this expansion of *Brady* because, he guesses that if he had been provided the impeachment evidence regarding Mr. Wright and Mr. Tribuiani, his trial counsel could have effectively used the evidence by persuading appellant not to take the stand and harm his cause through what amounted to perjury. According to appellant, *Brady* materiality must be evaluated by the speculative use

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. Post–Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*

that the defense possibly may have made of undisclosed evidence, and if the defendant claims he would not have testified, then the court later assessing *Brady* materiality cannot look to his trial testimony when assessing the fairness of the proceeding.

The Majority assumes the legitimacy of this theory "arguendo" and then rejects the claim, premised upon examination of a diminished trial record minus appellant's testimony. The Majority thus offers no view on the novel expansion appellant poses. I have no objection to dispositions premised upon an assumed point of law, if that is the more efficient manner of assessing a claim and the approach is unlikely to be mischaracterized and abused in future cases. But, in my view, the proper way to analyze appellant's claim of *Brady* materiality is to squarely address his assertion that the current law dictated by the U.S. Supreme Court commands that a PCRA petitioner pursuing a *Brady* claim is entitled to shield himself from his own trial testimony. I think this is particularly the case where, as here, the *Brady* claim is premised upon a misrepresentation of governing decisional law of the U.S. Supreme Court. Thus, I would reduce the Majority's "arguendo" analysis to a secondary holding.

The *Brady* analysis argued by appellant is erroneous for several reasons. First, the U.S. Supreme Court has never embraced his interpretation. Indeed, appellant's claim to the contrary is premised upon a mischaracterization of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Appellant states the following proposition as if it were black-letter law: "The proper *Brady* inquiry asks what 'course that the defense and the trial would have taken had the defense not been misled' and what impact the misconduct had on 'the preparation or presentation of the defendant's case.' *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375." Brief of Appellant, 25. From his assertion that mere effects upon defense preparation, rather than hard evidence, is the measure of *Brady* materiality, appellant argues his more radical extended rule that he may shield himself from his own prior testimony.

However, *Bagley* supports neither appellant's "defense effects" root rule, nor his testimonial immunity extension of the rule. Appellant's counsel—lawyers employed by the Philadelphia-based Federal Community Defender Office ("FCDO")—neglect to note that the *Bagley* language they cite and quote as governing black-letter law in fact represented the views of only two Justices in *Bagley*. It is not governing law. I examined and explained the non-precedential effect of this language at some length in my concurring opinion in *Commonwealth v. Willis,* 616 Pa. 48, 46 A.3d 648 (2012), a direct appeal case. *See id.* at 674–84 (Castille, C.J., concurring, joined by Eakin and McCaffery, JJ.) (addressing Court's erroneous apprehension of *Brady* materiality in *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242, 1245 (1994)).[3]

Moreover, nothing in the logic of *Brady* materiality suggests a design to shield a defendant from his prior testimony or perjury. The test for *Brady* materiality is the same as the test for *Strickland*[4] prejudice: whether there is a reasonable probability that the outcome of the proceeding would have been different. *See Kyles v. Whitley,* 514 U.S. 419, 433–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (U.S.1995) (noting that *Bagley* adopted *Strickland* formulation for *Brady* claims). The test, whether for *Brady* or *Strickland,* looks to the proceeding that actually occurred and attempts to assess its underlying fairness. *See id.* at 451, 115 S.Ct. 1555; *see also Bagley,* 473 U.S. at 678, 105 S.Ct. 3375. The High Court has never held that courts, charged with assessing *Brady* materiality by re-examining the trial that occurred in light of previously suppressed evidence, are obliged to diminish the record at that trial.

3. In *Willis,* I wrote because the lead opinion there, representing the views of two of six participating Justices, failed to squarely recognize that *Green* had misapprehended *Bagley* and federal law to the extent that it declared—as appellant here erroneously declares—that *Brady* materiality is measured by mere effects upon defense preparation, rather than hard evidence. *Id.* at 676 ("This key proposition of federal law is the sole product of the *Green* Court; it is erroneously stated as if it is the settled command of the High Court; and it cannot be squared with then-extant authority from the High Court.").

4. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Accordingly, appellant's theory is a non-starter. The expansion, if there is to be one, should come from the High Court.

Second and relatedly, this is a PCRA appeal. An assessment of the fairness of appellant's trial—whether he poses a *Brady* claim, a *Strickland* claim, or any other claim—is not measured by minority views in prior decisions or by hopeful predictions of where federal decisional law might someday go; it is measured by the existing law that governs. The only federal decisional law that governs in Pennsylvania is that commanded by the U.S. Supreme Court. Even assuming that the PCRA authorized present-day collateral relief premised upon predictions of developing federal doctrine—in fact, it does not—it would be unwise to undo final state convictions on such speculative grounds. The PCRA already specifically allows for relief premised upon new constitutional rulings from this Court or the U.S. Supreme Court, once a new rule has already been announced and held to have retroactive effect. *See* 42 Pa.C.S. § 9545(b)(1)(iii). Given that construct, there is no reason—or authority—to indulge speculative predictions about the future course of the law. Errors in such predictions are subject to correction only by the U.S. Supreme Court, which accepts a handful of cases from state courts in any given term, and has no particular incentive to correct erroneous predictions in state collateral appeals. And, errors in such predictions favoring the defense run the risk of arbitrarily releasing murderers.

Third, even if appellant's new rule were someday accepted, the mere assertion of his PCRA counsel that appellant would not have testified and perjured himself obviously would not be enough to prove that fact, and no measure of "arguendo" reasoning relieves appellant of his burden to support his PCRA claims factually on appeal. Appellant would have to support his claim through his own testimony and that of his trial counsel, and the PCRA judge would have to make an assessment of whether appellant would not have testified, if only he had known of impeachment evidence. Given appellant's headstrong, controlling performance at trial, it is not

particularly likely that his current counsel's speculations have any basis in fact.

Finally, I believe it is extremely unlikely that the U.S. Supreme Court would adopt a *Brady* materiality extension, such as that posed by appellant, which would immunize a defendant against the effects of his own trial testimony, much less his own false trial testimony. To borrow from the *Strickland* jurisprudence from which *Brady* materiality derives:

> It is true that while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. Thus, on the one hand, as *Strickland* itself explained, there are a few situations in which prejudice may be presumed.... And, on the other hand, there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate "prejudice." Even if a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. *Nix v. Whiteside,* 475 U.S. 157, 175–176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).
>
> Similarly, in [*Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) ], we concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incorrect interpretation of the law should be regarded as a potential "windfall" to the defendant rather than the legitimate "prejudice" contemplated by our opinion in *Strickland....* Because the ineffectiveness of Fretwell's counsel had not deprived him of any substantive or procedural right to which the law entitled him, we held that his claim did not satisfy the "prejudice" component of the *Strickland* test.

*Williams v. Taylor,* 529 U.S. 362, 391–93, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations and footnotes omitted). *Cf. Commonwealth v. Cox,* 581 Pa. 107, 863 A.2d 536, 556–57 (2004) (Castille, J., concurring) (strong argument to be made

that heightened prejudice standard under *Lockhart* should be applied to ineffectiveness claims with "fundamental substantive issues that would have to be resolved in defendant's favor before relief could be granted"); *United States v. Day*, 285 F.3d 1167, 1171 (9th Cir.2002) ("Because a defendant does not have a 'right' to commit perjury without suffering the consequences, the fact that counsel's ineffectiveness gave [defendant] an opportunity to commit perjury does not constitute deprivation of a right; accordingly, this portion of the sentence does not satisfy the prejudice component of *Strickland.*"). Again, in explicating both *Brady* and *Strickland*, the High Court has stressed the overriding concern of whether the defendant has received a fair trial. Fairness works two ways, the High Court teaches. When the defendant takes the stand and elects to testify, and then testifies absurdly or untruthfully, I doubt that the U.S. Supreme Court would hold that *Brady* requires courts to pretend that his testimony never existed.

The PCRA court rejected appellant's claim in part because his own testimony was so obviously false that it doomed him. Appellant now seeks to avoid the effect of his testimony in a case where the inquiry is required to focus on the fairness of his trial. For the reasons above, I would address his theory and hold that it is frivolous.

Justice EAKIN, concurring.

I join the majority opinion with the exception of its treatment of appellant's *Brady* claim, regarding which I join Chief Justice Castille's analysis.