J. A19036/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :     IN THE SUPERIOR COURT OF
                                        :         PENNSYLVANIA
              v.             :
                                          :
SHAWN JONES,                :         No. 1679 MDA 2017
                                          :
          Appellant     :

Appeal from the Judgment of Sentence Entered August 2, 2017,
in the Court of Common Pleas of Dauphin County
Criminal Division at No. CP-22-CR-0005871-2016

BEFORE:  GANTMAN, P.J., NICHOLS, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED NOVEMBER 01, 2018**

Shawn Jones appeals from the August 2, 2017 judgment of sentence imposed after a jury found him guilty of first-degree murder and firearms not to be carried without a license.[1]  After careful review, we affirm.

The trial court summarized the relevant facts of this case, as gleaned from the trial testimony, as follows:

> Sergeant Dave DeLellis of the Pennsylvania State Capitol Police Department was driving patrol on December 15, 2015.  As he drove in the area of Third and Calder Streets in Harrisburg, he heard gunshots. He observed two men shooting directly in front of him; the officers gave chase and ultimately Sergeant DeLellis did identify one of the shooters; however none were taken into custody.  DeLellis was never able to identify the other shooter.  The officers did apprehend Glenn Walker, Jr.

---

[1] 18 Pa.C.S.A. §§ 2501(a) and 6106(a)(1), respectively.

Glenn Walker, Jr., was friend[s] with the victim in this case, John Carter. His son, Glenn Walker, III, is friends with [appellant]. Mr. Walker, Jr. was the victim of an assault in a nearby bar known by various names (1400 Club or Wanda's most prominently). As some background to this incident, Glenn Walker, Jr. was in an altercation with a woman who believed he had not paid her the right amount for incense. By happenstance, [a]ppellant showed up at 1400 Club/Wanda's with Glenn Walker, III. Video evidence showed [a]ppellant and Glenn Walker, III approaching and entering the bar. Glenn Walker, Jr., identified the young men. The three men then exited the building. The woman called a friend to help her with Glenn Walker, Jr. When the woman's friend attacked him, Glenn Walker, III, shot at the attacker and shots were fired f[ro]m the area where [a]ppellant disappeared.

Several items of evidence were collected from the scene, the most important being three spent .45 cartridges, two different .45 cartridges, and a projectile.

Moving to March of 2016, Kristian Cammack and her fiancé, John Carter III, were taking two of their four children on a walk down memory lane in the uptown section of Harrisburg. They stopped by the house that Mr. Carter grew up in and as they left, the older child asked for a drink. As Ms. Cammack drove down the 2200 block [of] Green Street, they passed a group of men who glanced over at them and Mr. Carter glanced back. Neither of them recognized the men.

The family pulled up to the store, Ms. Cammack got out to buy some water and Mr. Carter got out to smoke a blunt. He told her to drive around the block while he finished his blunt. Ms. Cammack got the water, returned to her car and circled the block, but could not find him. Ms. Cammack tried calling his cell phone and he answered it but was unable to talk. She reversed up the street and saw people looking on Woodbine so she turned onto Woodbine and saw Mr. Carter laying on the ground. She immediately

rushed to him and saw that he was shot. She asked him who shot him and he said he did not know.

Ms. Cammack acknowledged removing a half of a blunt from Mr. Carter's pocket, but denied that he carried weapons and that she removed any weapons from his body.

Taji Abdullah testified for the Commonwealth. Mr. Abdullah is friends with [a]ppellant and Glenn Walker. He lived at 2233 Green Street. Mr. Abdullah testified that on the day in question, he was outside hi[s] home when John Carter drove down the street in his truck. They looked at each other and a few minutes later, Mr. Carter came walking up the street and grabbed the handle of a gun and asked Mr. Abdullah if he "wanted some problem" so Mr. Abdullah hit him. Mr. Abdullah had been staring at the truck because he was wary of strangers on his block after being shot a few weeks earlier.

Mr. Abdullah identified John Carter as the man he fought with on a neighbor's video surveillance. In the statement given April 1, 2015, Mr. Abdullah told police that he did not know if the victim had any sort of a weapon on him. However, Mr. Abdullah was able to identify himself, Glenn Walker, III, and [a]ppellant on the video.

The video showed Mr. Carter walking down Green Street and out of view. Then he came running back up Green Street with the three young men following him. Something caused [a]ppellant to stop chasing him and turn around. Thereafter, [a]ppellant and Mr. Walker, III, began chasing Mr. Carter again. Mr. Abdullah denied seeing anyone shoot Mr. Carter, but admitted to hearing gunshots and turning around to run away. Mr. Abdullah also identified Norbell Lynch in the video as the fourth person running after Mr. Carter. He did not know whether Mr. Lynch had a gun on him at the time, though he did appear to be holding something. Mr. Abdullah never saw [a]ppellant shooting a gun.

Dr. Wayne Ross testified that John Carter died of a gunshot wound to the back.

Norbell Lynch was in a romantic relationship with Abdullah's mother at the time of the incident. He knew Mr. Abdullah because of that relationship and he knew Mr. Abdullah's friends, [a]ppellant and Mr. Walker, III. Mr. Lynch was at the home the day that Mr. Carter was killed. Mr. Lynch arrived at the home about 1:00 p.m. and [a]ppellant[,] Mr. Abdallah and Mr. Mr. [sic] Walker, III, were all already there outside. Mr. Lynch saw that Mr. Walker, III, had a gun on him at that time.

He did not know Mr. Carter, but that day he saw Mr. Carter drive down the street and he saw Mr. Abdullah and Mr. Carter make eye contact as a female drove John down the street. The next thing he knew, Mr. Carter was walking back up the street and the fight started[.] Per Mr. Lynch, while everyone is out of sight on the video, Mr. Abdullah and Mr. Carter had words and then Mr. Abdullah hit Mr. Carter. Then [a]ppellant and Mr. Walker, III, jumped in on the fight. Mr. Carter managed to escape and began to run away.

As Mr. Carter was running away, Mr. Abdullah's mother came outside and told the men to "get him" at which point they took off after Mr. Carter. Mr. Lynch testified that Mr. Walker, III and [a]ppellant then began shooting at Mr. Carter. He recalled six shots.

Investigator Marc McNaughton of the Harrisburg Bureau of Police, processed the scene for evidence. Most relevant to the case at hand, he collected serval [sic] casings. Those casing[s] were identified as brass .45 Winchester, nickel .45 Hornady, and brass .45 Blazer.

A neighbor testified that she was home on the day in question. She originally heard a ruckus and asked her daughter to check outside. Her daughter came back to say there was a fight. Then they heard shooting. She went outside almost immediately after she heard

the shots and could not see anything but did hear someone screaming for help. A day or two later, the neighbor was gardening and found a gold grill in her garden. She gave it to police who happened to be canvassing the area.

The neighbor also saw Mr. Abdullah's mother in her garden picking up casings, just after the shooting. Through a stipulation, the jury learned that DNA on the grill matched that of [a]ppellant.

Mr. Abdullah's mother, Shariyka Muhammed testified. She indicated that Mr. Lynch was able to run and that on the day of the incident, he ran outside saying "I'm gonna go get him" when they found out her son was in a fight. She assumes it was in reference to the man Mr. Abdullah's [sic] was fighting with. She identified that fourth man in the video as Mr. Lynch.

Ms. Muhammed was questioned on cross examination as to whether she was a police informant and had an open drug case. Defense counsel objected but Ms. Muhammed had already answered the question and this Court deemed it relevant.

Todd Neumyer of the Pennsylvania State Police is a firearm and tool marking examiner. He performs microscopic analysis on the tool marks left behind on the surface of ammunition components when fired by a gun. He does these exams to determine if various bullets were discharged from the same firearm. He was admitted as an expert.

Neumyer examined the cartridges recovered at both the December 2015 and the March 2016 incidents. He was able to conclude that the four non-Glock cartridge cases from the Green Street scene matched the non-Glock cartridge cases from the incident at Third and Calder in December of 2015. Further, the non-Glock cartridges were discharged from the same unknown Glock at both scenes.

Trial court opinion, 3/1/18 at 2-6 (citations to notes of testimony omitted; footnotes omitted).

Appellant was subsequently arrested and charged with first-degree murder; firearms not to be carried without a license; and persons not to possess, use, manufacture, control, sell, or transfer firearms.[2]  On March 30, 2017, appellant filed a motion **in limine** to exclude video of the December 15, 2015 shooting at the 1400 Club/Wanda's.  (**See** Omnibus Pretrial Motion, 3/30/17 at ¶¶ 17-30.)  Following a pre-trial hearing, the trial court denied appellant's motion on April 19, 2017.  On May 22, 2017, appellant proceeded to a jury trial and was found guilty of the aforementioned offenses on May 25, 2017.  On August 2, 2017, the trial court sentenced appellant to life imprisonment without the possibility of parole for first-degree murder and a concurrent term of seven years' probation for firearms not to be carried without a license.  On August 10, 2017, appellant filed timely post-sentence motions that were denied by the trial court on October 13, 2017.  This timely appeal followed on October 30, 2017.  On November 1, 2017, the trial court ordered appellant to file a concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(b).  Appellant complied with the trial court's order, and the trial court issued its Rule 1925(a) opinion on March 1, 2018.

Appellant raises the following issues for our review:

---

[2] 18 Pa.C.S.A. § 6105(a)(1).  This charge was **nolle prossed** by the Commonwealth prior to trial.

> 1. Did the trial court improperly allow the admission of video evidence and testimony about an unrelated and uncharged shooting in violation of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Article I, §§ 6 and 9 of the Pennsylvania Constitution, and Pa.R.E. 401, 403, and 404?
>
> 2. Did the trial court abuse its discretion and commit legal error by failing to provide the jury with a cautionary instruction that evidence of [a]ppellant's alleged bad act was admitted for a limited purpose and must not be considered or regarded as showing [a]ppellant's guilt?
>
> 3. Did the trial court abuse its discretion and commit legal error when it overruled an objection to the prosecutor's questioning of Shariyka Muhammad, a witness who provided helpful defense testimony, about her open drug case and status as a police informant?

Appellant's brief at 2.

Appellant's admissibility of evidence claim is three-fold. Appellant first argues that the trial court abused its discretion in permitting the Commonwealth to introduce surveillance video of the December 15, 2015 shooting at the 1400 Club/Wanda's. (*Id.* at 20.) Appellant maintains that this video had "no relevant value"; was "incredibly prejudicial"; and was inadmissible as "prior bad act" evidence under Pennsylvania Rule of Evidence 404(b)(1) because it was offered "only for the prohibited purpose of showing that [he] had a propensity for violence." (*Id.* at 5, 21-23). We disagree.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. Fransen**, 42 A.3d 1100, 1106 (Pa.Super. 2012) (citation omitted), **appeal denied**, 76 A.3d 538 (Pa. 2013). "An abuse of discretion is not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." **Commonwealth v. Antidormi**, 84 A.3d 736, 745 (Pa.Super. 2014) (citation omitted), **appeal denied**, 95 A.3d 275 (Pa. 2014).

> The threshold inquiry with admission of evidence is whether the evidence is relevant. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact.

**Id.** at 750 (citations and internal quotation marks omitted); **see also** Pa.R.E. 401(a), (b).

Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1); **see also Commonwealth v. Weakley**, 972 A.2d 1182, 1189 (Pa.Super. 2009) (stating, "[e]vidence of distinct crimes is not admissible against a defendant being prosecuted for another crime **solely**

to show his bad character and his propensity for committing criminal acts." (citation omitted; emphasis in original)), ***appeal denied***, 986 A.2d 150 (Pa. 2009). Evidence of prior bad acts may be admissible, however, "when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." ***Commonwealth v. Ross***, 57 A.3d 85, 98 (Pa.Super. 2012) (citations omitted), ***appeal denied***, 72 A.3d 603 (Pa. 2013). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." ***Ross***, 57 A.3d at 98 (citation omitted).

Upon review, we conclude that the surveillance video was admissible because it was relevant to establish the identity of the firearm used in the instant case and the fact that appellant was present on a prior occasion, on December 15, 2015, when this same firearm was utilized. Specifically, the video depicts Glenn Walker, III, exit the 1400 Club/Wanda's on December 15, 2015, approximately three months before Carter was murdered, with two other individuals and discharge a firearm. (Notes of testimony, 5/22-25/17 at 50-52.) Ballistics testing matched the tool markings on the cartridge cases recovered from the scenes of the December 15, 2015 and the March 26, 2016 shootings, indicating the same gun used in each instance. (***Id.*** at 279, 286-287, 346-347.) Additionally, Glenn Walker, Jr., positively identified appellant as one of the men in the video. (***Id.*** at 44-45.) Based on the foregoing, we

discern no abuse of the trial court's discretion in permitting the Commonwealth to introduce this video surveillance evidence at trial. ***See Ross***, 57 A.3d at 98.

Appellant next argues that it was improper to admit the video and testimonial evidence about the December 15, 2015 shooting because the expert testimony of Pennsylvania State Trooper Todd Neumyer, upon which the trial court relied, was "based on faulty science." (Appellant's brief at 23-30.)

Expert testimony is admissible if it concerns a subject beyond the knowledge, information, or skill possessed by the average layperson, as phenomena and situations that are matters of common knowledge may not be the subject of expert testimony. Pa.R.E. 702.

> [I]n cases involving the admission of expert testimony . . . the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice.

***Commonwealth v. Huggins***, 68 A.3d 962, 966 (Pa.Super. 2013) (citation omitted), ***appeal denied***, 80 A.3d 775 (2013).

At trial, Trooper Neumyer, a firearm and toolmark examiner with the Harrisburg Regional Crime Laboratory, testified that he could render an expert opinion with respect to the cartridges recovered from both the December 2015 and the March 2016 shootings. (Notes of testimony, 5/22-25/17 at 326, 330.)

Neumyer opined, based on his research and 17 years' experience in the discipline, that he could state to a reasonable degree of scientific certainty that the four non-Glock cartridge cases recovered in the March 26, 2016 shooting matched the non-Glock cartridge cases from the December 15, 2015 shooting. (*Id.* at 338-340, 346-347, 351, 358-360.) Additionally, Neumyer testified that the non-Glock cartridges were discharged from the same unknown Glock at both scenes. (*Id.*) The record reflects that appellant never objected to Neumyer's expert testimony regarding the degree of scientific certainty of his findings. Accordingly, appellant has waived this claim on appeal. *See Commonwealth v. Houck*, 102 A.3d 443, 451 (Pa.Super. 2014) (stating, "the failure to make a timely and specific objection before the trial court at the appropriate stage of the proceedings will result in waiver of the issue." (citation omitted)).

In any event, even if appellant had properly preserved an objection to Trooper Neumyer's expert testimony, we would find his claim to be without merit. Appellant asks us to reassess the general admissibility of forensic firearms evidence; we decline to do so. In *Commonwealth v. Whitacre*, 878 A.2d 96 (Pa.Super. 2005), *appeal denied*, 892 A.2d 823 (Pa. 2005), a panel of this court held that expert ballistic matching evidence obtained by a comparison microscope, like Neumyer used in this case,[3] is "generally accepted by the scientific community consisting of firearms experts." (*Id.* at

---

[3] *See* notes of testimony, 5/22-25/17 at 336-337.

101.) The ***Whitacre*** court notes that "[t]he comparison microscope examination method has been in use since the 1930's and is an accepted methodology by the Association of Firearms and Toolmark Examiners." Accordingly, appellant's claim would nonetheless fail. ***See Huggins***, 68 A.3d at 966.

Appellant next contends that the trial court abused its discretion in failing to undertake additional analysis as required by Pennsylvania Rule of Evidence 404(b)(2) and "properly weigh whether the probative value [of the video evidence] outweighed any danger of unfair prejudice." (Appellant's brief at 31.) We disagree.

Instantly, the trial court set forth the following rationale in support of its decision to deny appellant's motion ***in limine*** to exclude video of the December 15, 2015 shooting at the 1400 Club/Wanda's:

> THE COURT: And, in essence, there was no argument that either one of them were [sic] charged in the previous video. It was set up for the purpose of showing that they were there and that the caliber of gun and the shells that were found on the one scene were also found in the second scene. So it will be allowed.

Notes of testimony, 4/19/17 at 10.

Although appellant is correct that "the trial court is obliged to balance the probative value of such evidence against its prejudicial impact[,]" ***see Ross***, 57 A.3d at 98 (citation omitted), our supreme court has explicitly recognized that a trial court is not required "to articulate its balancing test on

the record." ***Commonwealth v. Hairston***, 84 A.3d 657, 667 (Pa. 2014), ***cert. denied***, 135 S.Ct. 164 (2014). Rather, "[w]e presume that trial courts know the law . . . [and s]uch weighing and the general consideration of the admissibility of evidence is a discretionary ruling which trial courts routinely engage in mentally. **There is no requirement that it record these mental deliberations on the record.**" ***Id.*** (emphasis added).

Here, we are satisfied by the trial court's discussion of why it considered the aforementioned video admissible that it understood the applicable criteria and mentally engaged in the appropriate balancing test. There is nothing in this record to suggest that this trial court did not understand its duty to weigh the evidence in accord with Rule 404(b)(2).

Accordingly, for all the foregoing reasons, we discern no abuse of discretion on the part of the trial court in allowing the video and testimonial evidence of the December 15, 2015 shooting to be admitted into evidence.

In his second issue, appellant argues that the trial court abused its discretion "when it failed to provide the jury with a cautionary instruction that evidence of [a]ppellant's alleged prior bad act was admitted for a limited purpose and must not be considered as evidence of guilt or bad character." (Appellant's brief at 41.) In support of this contention, appellant relies on ***Commonwealth v. Weiss***, 81 A.3d 767 (Pa. 2013), wherein our supreme court stated:

> [W]hile evidence of prior bad acts may be relevant
> and admissible, there is the potential for

>       misunderstanding on the part of the jury when this
>       type of evidence is admitted. This evidence must,
>       therefore, be accompanied by a cautionary
>       instruction[,] which fully and carefully explains to the
>       jury the limited purpose for which that evidence has
>       been admitted.

*Id.* at 798 (citations and internal quotation marks omitted); *see also* appellant's brief at 43.

Here, however, the record reveals that appellant did not specifically request that a cautionary instruction be given to the jury after the Commonwealth sought to introduce the video of the December 15, 2015 shooting, nor did he object to the trial court's failure to provide said instruction at the conclusion of trial. (*See* notes of testimony, 5/22/17 at 43-44.) The "[f]ailure to request a cautionary instruction upon the introduction of evidence constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction." *Commonwealth v. Bryant*, 855 A.2d 726, 739 (Pa. 2004). Consequently, we agree with the trial court that appellant waived this claim.[4]

In his final claim, appellant argues that the trial court abused its discretion when it permitted the Commonwealth to cross-examine defense witness Shariyka Muhammad "about whether she had an open drug case and whether she was a police informant." (Appellant's brief at 49.) We disagree.

---

[4] To the extent appellant argues that his trial counsel was ineffective for failing to request a cautionary instruction, we note that, absent limited circumstances, "claims of ineffective assistance of counsel are to be deferred to PCRA review[.]" *Commonwealth v. Reid*, 117 A.3d 777, 787 (Pa.Super. 2015) (citation omitted); *see also* appellant's brief at 46.

"The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." **Commonwealth v. Chmiel**, 889 A.2d 501, 527 (Pa. 2005) (citation and internal quotation marks omitted), **cert. denied**, 549 U.S. 848 (2006). "[T]rial judges retain wide latitude as to the scope of cross-examination." **Commonwealth v. Murphy**, 182 A.3d 1002, 1005 (Pa.Super. 2018) (citation omitted).

Instantly, the record reflects that appellant failed to specifically object to the Commonwealth's inquiry as to whether Muhammad had a pending drug charge:

> Q    Ma'am, you have a pending felony drug delivery charge?
>
> A.    Yep.
>
> Q.    I believe --
>
> A.    Trumped up charges that you all put on me, yes.

Notes of testimony, 5/24/17 at 389.

Accordingly, appellant has waived his challenge to this specific inquiry. **See Houck**, 102 A.3d at 451; **see also** Pa.R.A.P. 302(a) (stating an issue not raised in the trial court is considered waived for purposes of appellate review).

Thereafter, the following exchange occurred between the Commonwealth and Muhammad during which appellant lodged an objection:

> Q.    You had an opportunity to talk to Detective Iachini?

> A. While I was down there, of course, yes.
>
> Q. You actually have a relationship with Detective Iachini?
>
> A. I mean, yes. I got a relationship with a couple officers, detectives.
>
> Q. In fact, you've been an informant in the past for Detective Iachini?
>
> [Appellant's counsel]: Objection. It's not relevant.
>
> [Commonwealth]: Of course it is.
>
> THE WITNESS: No.

Notes of testimony, 5/24/17 at 392.

Upon review, we agree with the trial court that this line of inquiry was relevant to establishing whether Muhammed had a prior relationship with police and would not be apprehensive about speaking to them with regard to what she witnessed on the day in question. Moreover, we find that any resulting prejudice was minimal and could not have outweighed the probative value of this brief cross-examination. Accordingly, we discern no abuse of discretion on the part of the trial court in permitting the Commonwealth to cross-examine Muhammad as to whether she was a police informant.

Based on the foregoing, we affirm the trial court's August 2, 2017 judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/1/2018